# IN THE SUPREME COURT OF IOWA

No. 10–0218

Filed January 13, 2012

**STATE OF IOWA,**

    Appellee,

vs.

**DENNIS DUANE RICHARDS,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Des Moines County, Mary Ann Brown, Judge.

The State seeks further review of a court of appeals decision reversing the defendant's convictions and sentence for second-degree murder and second-degree arson and remanding for a new trial. **COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Nan Jennisch, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney General, Patrick C. Jackson, County Attorney, and Tyson Rogers and Jennifer Slocum, Assistant County Attorneys, for appellee.

**MANSFIELD, Justice**.

Dennis Richards was convicted of second-degree murder and second-degree arson for strangling his ex-wife to death and setting her house on fire. The court of appeals reversed the convictions and remanded for a new trial after concluding Richards should have been allowed to call a physical therapist in his defense, even though the witness had been disclosed a day late. We now vacate the decision of the court of appeals and affirm Richards' convictions. In our view, even if the district court erred in excluding the therapist, any error was harmless, in light of the overwhelming evidence of Richards' guilt.

## I. Facts and Procedural History.

Around 9:45 p.m. on January 4, 2009, neighbors smelled and saw smoke coming from the one-story home of Cyd Richards in Burlington. The front door was locked, and the house was filling up quickly with smoke. Emergency personnel responded promptly. They found Cyd's body lying faceup on the floor in one of the bedrooms. There was blood around her nose and mouth. Cyd was not breathing and she had no heart beat. Efforts to revive her on the scene were unsuccessful. She was evacuated to a local hospital and pronounced dead at 10:47 p.m. that evening. Meanwhile, firefighters battled the blaze in her house.

The medical staff who examined Cyd at the hospital found no evidence she had inhaled smoke or suffered burns. Her body was cold to the touch, and her body temperature was well below normal, indicating she had been nonresponsive for some time. A nurse noticed scratches on her neck and bruising behind her left ear. There was blood on Cyd's t-shirt and pajama pants.

The defendant Dennis Richards had married Cyd in 2001. The couple separated a few years later and divorced in 2007. In the summer

of 2008, they had reconciled and, in December 2008, decided to remarry. Richards, however, was still living in his own apartment on January 4, 2009. The apartment was located a few miles from Cyd's house.

A police officer and a police chaplain tracked down Richards at 11:00 p.m. to inform him of his ex-wife's death. Richards at the time was walking outside his apartment. Richards appeared to be in grief as he heard the news.

Richards told the officer and the chaplain he had gone directly to Cyd's house after finishing his work shift at Advance Auto Parts around 7:20 p.m. that evening. Richards said he had then driven back to his house at some point to get clothes before returning to Cyd's. According to Richards, upon his return, he and Cyd had argued, and he had left her home for good around 8:30 or 9:00 p.m. Richards said both of them had made comments to the effect they couldn't live without each other, and both of them had talked about harming themselves. The police officer noticed that Richards had a large scrape above his left eye that appeared to be recent. A photograph of that fresh abrasion was introduced into evidence at trial. Richards told police he had hit his head on his car door.

One of Richards' relatives soon drove Richards to the hospital. On the way there, Richards asked to take a detour past Cyd's house. The relative noticed that Richards had fingernail scratch marks on his hands, as well as the abrasion on his forehead. Richards told her the marks on his head and hands came from working on a car. Photographs of Richards' hands showing the recent scratch marks were also admitted into evidence at trial. Another relative spoke with Richards at the hospital and received a different explanation for the marks—namely that

he had "bumped his head on a door and scratched his hands on stuff at work, on cardboard and such."

At the hospital Richards asked a detective if the person who had been setting fires in Burlington could be the same person who set Cyd's house on fire. At that point, no one had indicated that arson was even suspected in the burning of Cyd's house. Also, the detective knew the person responsible for the other arsons had been arrested on December 25 and had confessed. Richards also commented at the hospital that Cyd lived in a bad neighborhood.

At 4:30 a.m., the police returned to Richards' apartment and asked if he would come to the station for questioning. In the early stages of this recorded interview, Richards appeared to be distraught as he spoke about Cyd, but as the interview progressed, his manner became colder and more rigid.

Richards indicated that he had concerns both about the neighborhood where Cyd lived and the restaurant where she worked as a cook. He repeatedly told the officers to "check out" the restaurant. Richards mentioned there had been an incident on New Year's Day when he had helped Cyd clean up at the restaurant and had found a substance which she immediately identified as Ecstasy. Richards said that he had seen Cyd with substantial cash in the past and that he had threatened to report Cyd to the IRS. He also mentioned Cyd might have been involved in drug transactions at the restaurant.

Richards initially told the detectives in the interview that he had suffered his forehead injury while he was getting out of his car. He denied Cyd had caused the injury. However, later in the interview, when asked if Cyd might have caused the gouge on his forehead during an argument, Richards said that he and Cyd had gotten into a discussion

over the restaurant incident when he was over at her house and that Cyd had flung her arms in the air and struck him in the head. Richards continued to claim, nonetheless, that he had suffered his hand injuries from changing batteries while working that day at Advance Auto Parts.

Richards told the detectives he had simply walked out of her house calmly when Cyd flung her arms in the air and hit him in the head. However, Richards also acknowledged that during the course of his relationship with her, there were times when Cyd would flare up and he would respond by also flaring up and they would get into a physical confrontation. He admitted there had been incidents in the past where Cyd had called the sheriff on him.

Richards also indicated in the interview that he had stopped drinking five months before Cyd's death, but had resumed drinking two days before her death. He said Cyd would get mad when she smelled alcohol on him.

At the end of the interview, Richards was asked about the clothing he had been wearing earlier in the evening. He admitted he had changed out of the black jeans, black turtle neck, and coat he had been wearing before. The detectives asked if it would be all right if they followed Richards home and tested that clothing for blood. At that point, Richards said there might be some of Cyd's blood on his clothing, and he made a comment that Cyd had had a bloody nose in his apartment some days before, although he added her blood would not be on the items he had worn earlier in the evening.

That afternoon a search warrant was executed at Richards' apartment. A pair of black jeans, a black turtle neck, and a coat were found inside the washing machine. They were wet and recently laundered. Although the hamper was full of dirty laundry, only those

three items had been washed. In his interview with the detectives that morning, Richards had said that when he did the wash, he washed "everything."

The investigators also found two gas cans and an empty Gatorade bottle on Richards' porch. The Gatorade bottle had a gasoline odor and was later determined to have a residue of gasoline. A working fire starter was also found in the console of Richards' car.

An autopsy was performed on Cyd's body the next day, January 6. The medical examiner concluded Cyd had died from asphyxiation due to strangulation. There was no evidence she had inhaled smoke or carbon monoxide. Thus, she had died before the fire occurred. There were petechiae over the surface of her larynx, and the larynx itself was fractured, consistent with her having been strangled to death. The hyoid bone was also injured, and Cyd's face and neck had bruises and scratches. The examiner theorized that some or all of the fingernail marks on Cyd's neck could have been self-inflicted when she tried to remove her assailant's hands. Cyd's nails were bloody, cracked, and damaged. She also had bruising on her hands and arms, consistent with an attempt to defend herself.

The medical examiner noticed blood under several of Cyd's fingernails. Fingernail clippings were removed and sent to the State's crime lab for testing. Upon testing, Richards' DNA was discovered to be the major contributor, indicating that the blood under Cyd's nails was his. There was also DNA from a minor contributor, but the profile was too weak to permit identification. According to the medical examiner, that individual could have been Cyd herself, if she had bits of her own skin cells under her nails, or it could have been a third party with whom Cyd had shaken hands, for example.

Cyd's bloody t-shirt was also tested. One blood stain matched Richards' DNA, and the other three stains matched Cyd's DNA.

Another recorded interview of Richards took place on January 6. This time Richards was read and waived his *Miranda* rights before questioning commenced. Richards related essentially the same version of events he had given the previous day. However, he now claimed that he did not begin drinking again until after Cyd's death. He said he had kicked drinking to win back Cyd's love and affection. He repeatedly asserted in the interview that he did not have a temper and never lost his temper.

At the conclusion of this questioning, Richards was arrested. He was later charged on January 16, 2009, with second-degree murder and second-degree arson in violation of Iowa Code sections 707.1, 707.3, 712.1, and 712.3 (2009).

On October 26, 2009, the State moved to amend the trial information to charge Richards with first-degree murder. This motion was denied by the district court on November 9, 2009. The court reasoned that the evidence of premeditation came from witnesses who had been on the State's original witness list and was not "newly-discovered." The State then filed both a separate trial information for first-degree murder and a motion to consolidate the two cases against Richards. On November 17, 2009, the district court denied the motion to consolidate. The court stated it was "not appropriate to force the Defendant to defend the Murder in the First Degree case within the next two months" and noted the defendant had not waived his right to be tried within one year of the trial information.

Trial was scheduled to begin on December 1, 2009, the Tuesday after Thanksgiving. On Friday, November 20, 2009, Richards filed a

notice of defense witnesses. That notice added Richards' parents, Olen and Ruby Richards, to the previous list of defense witnesses. On Monday, November 23, 2009, at 4:16 p.m., Richards filed a notice of an additional defense witness. This second notice added physical therapist Dan Miller-Jacobs as a defense witness. Around 4:30 p.m. that day, Richards' counsel phoned the assistant county attorney and explained his plan to use Miller-Jacobs as an expert on Richards' physical condition, including Richards' "grip strength."

The next morning, Tuesday, November 24, 2009, the State filed a motion to strike Olen Richards, Ruby Richards, and Dan Miller-Jacobs as witnesses. The State argued that with the Thanksgiving holiday to occur on the 26th, it had only three business days remaining before trial and its counsel were too busy with preparation of the State's case-in-chief to take depositions of or investigate these new witnesses.

Richards filed a resistance to the State's motion later that same day. Richards argued the decision to add Miller-Jacobs was made in good faith. As Richards explained, after he was allowed to add a second counsel to his defense team, that attorney—"a second set of eyes"—visited the jail on November 13 and learned Richards was using a walker. At that point, defense counsel decided to obtain Richards' medical records and retain a physical therapist. The therapist, Miller-Jacobs, was not able to meet with Richards personally until the afternoon of November 23, shortly before his identity was disclosed to the State.

Richards offered the State the opportunity to depose or interview Miller-Jacobs during the week of November 23, but the State declined.

Before the commencement of trial on the morning of December 1, 2009, the district court ruled that Richards would be able to call his

mother to testify as a fact witness on his physical condition, but declined to allow Richards to call Miller-Jacobs as an expert. The court explained:

> A lay witness versus an expert witness, I classify in two different categories.
>
> . . . .
>
> . . . [T]he State ought to have the right to get their own expert to rebut or at least to even train them on how to cross-examine this expert.
>
> Maybe the State wouldn't even want to have an expert testify, but they ought to be able to have [that] expert look at the records to give them information on how to cross-examine the fellow. And so because of that I am going to grant the State's motion to strike the expert.
>
> But I look at the mother's testimony a little bit different. You could talk to her, depose her and probably find out what she has to say and cross-examine her as any lay person; and I think that the State can probably live through that without the economy of this and judicial administration of this case being compromised. So I will not grant the motion to strike as to Mrs. Richards.

Trial took place from December 1 through December 11. One of the State's witnesses was Tyler Garrison, an assistant manager at Advance Auto Parts. According to Garrison, when Richards worked there on January 4, 2009, he was more reserved and irritated than usual. Garrison testified he learned from Richards that he had had an argument with Cyd the previous evening. Cyd wanted to leave Richards' apartment; he refused to let her leave and wanted her to have sex with him; and she threatened to call the police. According to Garrison's recollection of what Richards told him:

> [H]e said they got in an argument.
>
> She was over at his house at his apartment and I guess he was trying to pursue sex and she said, no, she wanted to leave. And he said, good luck, my car's parked behind you. And she said, well, move it. . .

And she—she mentioned she wanted to leave. He said, no, you can't, I'm parked behind you. And she said she'll call the cops. And he said, go ahead. . .

And I guess he—they were in the bedroom and she wanted to leave again. He wouldn't let her leave and I recall him saying, if I want to touch your leg, I want to touch your stomach or your crotch, I will. And that's pretty much where it ended.

Garrison also testified that Richards had talked about pushing and shoving occurring in their relationship during the six months to a year before Cyd's death. Based on Richards' statements, Garrison believed Richards and Cyd had a "very rocky" relationship.

Garrison said that Richards did not install any batteries or perform any battery checks on January 4, and he did not have the scrape over his eye or the hand injuries that day.

According to Garrison, Richards had no work limitations. He performed deliveries and never used a walker or cane at work. Richards climbed ladders to get parts. He lifted, held, and gripped items such as batteries, CV shafts, alternators, and starters.

Cyd's landlord William Furman also testified. Furman said he had leased Cyd's house to her in March 2008. At that time, Cyd told Furman she wanted her location kept secret because Richards had been abusing her at her previous place and she was afraid he would find out where she lived. Later, Furman saw Richards' car in front of the house.

One of Cyd's sisters testified that Cyd had lived in an apartment below Richards' apartment until the spring of 2008, but moved out because she had to get away from Richards and was feeling scared. Later, according to the sister, Cyd and Richards reconciled, and Cyd said she was trying to change his drinking.

Another of Cyd's sisters testified she was with Cyd and Richards on New Year's Eve 2008, i.e., a few days before her death. The sister

noticed Richards getting up and following Cyd wherever she went, such as to get food or to the bathroom. This sister had never known Richards to have any mobility issues and had seen him carrying a cooler into a house.

Cyd's daughter from a previous marriage also testified. She remembered that shortly before Cyd moved from the apartment below Richards' apartment to her own house in 2008, her mother came down the steps upset and crying. Cyd told her daughter that Richards had put a cane to her neck and "that was the last straw . . . she wanted to find somewhere else to live." The daughter noticed that Cyd's neck was red.

This daughter testified that Richards used a wheelchair, a walker, and a cane after he had toe surgery several years before. Generally, however, he walked normally. She added that Richards had no trouble carrying boxes.

In addition, a neighbor of Richards, Marcus Green, testified. Green said he heard an argument between Richards and Cyd early in the morning on January 2, 2009, two days before Cyd was killed. When Richards saw Green later in the day, he apologized for the disturbance and said, "I think I'll just kill her." Green said he didn't take the statement seriously at the time, figuring it was a joke. Green made it clear that he liked Richards. As he put it, "You couldn't ask for a nicer guy."

A fire investigator testified that he had been able to rule out numerous possible accidental causes for the fire at Cyd's home. He concluded the fire had been intentionally set using an open flame.

The defense did not dispute that Cyd had been strangled to death but argued Richards was not the murderer. Richards did not take the stand. In the relatively brief defense case, a husband and a wife testified

that each of them had seen someone (not Richards) around 5 p.m. on January 4 walking in the vicinity of Cyd's home and saying on the cell phone, "I'm at Cyd's house."

Richards' mother Ruby also testified. She said that her son had used a walker and then a cane for a time after he had surgery in 2001 and that he complained of back pain through the years.

The defense also made an offer of proof regarding Miller-Jacobs' testimony. In the offer of proof, Miller-Jacobs testified he had taken a medical history and examined Richards at the jail on November 23, 2009; he had also reviewed some medical records. According to Miller-Jacobs, Richards suffered from chronic back pain and was taking various medications; his mobility was somewhat limited. Miller-Jacobs said he had also used a dynamometer to test Richards' hand grip strength and found that it was significantly below average in both hands. Miller-Jacobs admitted, however, "I don't normally treat grip problems."

The defense included in its offer of proof some exhibits to show the prosecution would have been prepared to counter Miller-Jacobs' testimony. These included a November 5, 2009 incident report where Richards tried to use his walker to climb up to the window in his cell. As a result of this incident, the walker was taken away.

The defense also introduced two state investigator reports that reflected interviews conducted at the jail on November 25, after Richards had disclosed to the prosecution his plan to call Miller-Jacobs. Correctional officers told the investigators that Richards "puts on a show when his parents and attorney come to visit him . . . [and] acts as [if] he is physically disabled." One correctional officer recalled that he used to deliver salt to Richards' apartment complex and that Richards would carry the eighty pound bags or even help deliver them himself. Another

officer said she had seen Richards take apart a remote control with his hands in the jail.  A registered nurse who worked part-time in the jail said he had attended to Richards on several occasions.  He was not aware of any physical problems with Richards other than back pain and at times numbness in the legs.  The nurse told the investigators that "he has shaken hands with Dennis Richards several times and . . . Richards has a firm grip. . . .  Richards['] grip strength is normal for a person of Richards'[] age. . . .  Dennis Richards does possess the strength and capability to physically strangle another person."

The district court declined to modify its earlier ruling excluding Miller-Jacobs.  It explained:

> Well, I'm not going to change my earlier ruling which granted the State's motion to strike this witness for several reasons.  I recognize that Rule 2.13(4) provides that the Court may, if no less severe remedy is adequate to protect the State from undue prejudice, order the exclusion of such witnesses if they're not disclosed at least nine days before trial.
>
> And I recognize that that looks at exclusion as an ultimate sanction and that the Court should try to fashion some other remedy short of that if possible.  And I want to explain for the record why I determined that there was no other remedy short of that that was adequate to protect and not create undue prejudice to the State in this case.
>
> First of all, you need to look at this history of this case. The charges were filed in January of 2009.  Trial was originally scheduled to start in October of 2009.  Through various reschedules because of counsel's unavailability due to health problems and then the State having one of its attorneys at a conference, I rescheduled the case to the last two weeks, being the first two weeks of December.
>
> This case has to be tried—started, I should say, started by January 16, 2010.  We have a Christmas holiday, we have a New Year's holiday, and we now have three furlough days in the month of December and one furlough day in the month of January in that time frame.
>
> I concluded that it was impossible to continue this trial to allow the State any flexibility in connection with this

witness. So one of the first options I would have had short of the sanctions of excluding the witness was to reschedule trial and continue it. And I concluded that we just could not reschedule this trial and allow and still provide that Mr. Richards have his case tried within one year of the Trial Information being filed. So, first of all, that option I didn't think was available to me.

The second one was, of course, I could order discovery reopened and allow the State to depose this witness and commence its own discovery in the midst of the case and long after it was closed. But discovery of what Mr. Miller–Jacobs had to say was only the beginning of what the State would have to do.

If Mr. Miller-Jacobs had merely been a lay witness, a friend of Mr. Richards, someone who observed Mr. Richards, I would not have struck him. I did not strike the late notice of his mother as a witness. But Mr. Jake—Miller-Jacobs is an expert witness and I believe that any time a party calls and anticipates having an expert witness testify, the other side has its—a right to get its own expert and I concluded that it was not practicable for the State to with, as Mr. Richards—Mr. Rogers has talked about, just four or five business days before trial to locate, get a commitment that the person would work for them, and then have that person conduct whatever independent investigation, research that they wanted to have done to be able to testify in this case.

And because this witness was an expert witness, I concluded that the late notification of not only his proposed testimony but the issue itself was clearly prejudicial to the State and that the only way that we could protect and create—and not provide for that prejudice was to exclude the testimony of the witness.

The jury found Richards guilty of both second-degree murder and second-degree arson. On January 19, 2010, Richards was sentenced to fifty years in prison on the murder conviction and ten years in prison on the arson conviction, with the sentences to run consecutively.

Richards appealed, raising two arguments through his appointed counsel. First, Richards claimed the trial court erred in admitting evidence of "prior bad acts," specifically his alcohol use, his prior incidents of domestic violence, and his statement to Green two days before Cyd's death that "I think I'll just kill her." Second, Richards urged

the trial court should not have excluded Miller-Jacobs' testimony. We transferred the case to the court of appeals.

The court of appeals reversed for a new trial on the second ground, without reaching the first issue. Thus, the court of appeals found the district court abused its discretion in refusing to allow Miller-Jacobs to testify. The court reasoned the disclosure was only one day late, and the record did not show there was inadequate time to depose Miller-Jacobs and obtain a rebuttal expert if necessary. The court also found the district court could have continued the trial. Lastly, the court of appeals found the exclusion of Miller-Jacobs' testimony was prejudicial because of the importance of that testimony to Richards' defense.

We granted the State's application for further review.

**II. Standard of Review.**

We review orders excluding witnesses to determine if the trial court abused its discretion. *State v. Babers*, 514 N.W.2d 79, 82 (Iowa 1994). "An abuse of discretion will not generally be found unless the party whose rights have been violated suffered prejudice." *Id.*

Likewise, "[w]e review a district court's evidentiary rulings regarding the admission of prior bad acts for abuse of discretion." *State v. Cox*, 781 N.W.2d 757, 760 (Iowa 2010). An abuse of discretion occurs when the trial court exercises its discretion "on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Maghee*, 573 N.W.2d 1, 5 (Iowa 1997).

**III. Legal Analysis.**

**A. Exclusion of Defense Expert Witness.** We begin our analysis with the point on which the court of appeals reversed the district court. Iowa Rule of Criminal Procedure 2.13(4) provides:

> *Failure to comply.* If the defendant has taken depositions under rule 2.13(1) and does not disclose to the prosecuting attorney all of the defense witnesses (except the defendant and surrebuttal witnesses) at least nine days before trial, the court may order the defendant to permit the discovery of such witnesses, grant a continuance, or enter such other order as it deems just under the circumstances. It may, if it finds that no less severe remedy is adequate to protect the state from undue prejudice, order the exclusion of the testimony of any such witnesses.

Here, Richards had taken depositions and therefore was under a rule 2.13(4) obligation to disclose all his defense witnesses at least nine days before trial. Trial was scheduled to begin the morning of Tuesday, December 1. Richards disclosed Miller-Jacobs late on the afternoon of Monday, November 23, i.e., less than eight days before trial. The State moved the following morning to preclude Miller-Jacobs from testifying.[1]

The State argued in its November 24 motion to strike that it was too busy to depose or interview Miller-Jacobs before trial because "the prosecution schedule is absolutely full and devoted to preparing its own case-in-chief, preparation of witnesses, and preparation for jury selection." Even though there was an intervening Thanksgiving holiday, we are not particularly impressed by this excuse. All pretrial schedules are busy, and two prosecutors were working on this case. In fact, the State found time on November 25 to conduct several interviews at the jail anticipating it might have to rebut Miller-Jacobs' testimony.

Also, we agree with the court of appeals that the court could have continued the trial past the January 16, 2010 one-year deadline without triggering a dismissal of the case. *See* Iowa R. Crim. P. 2.33(2)(*c*)

---

[1]Richards filed a resistance to the State's motion to strike the same day, but there is no indication in the record that either party sought to have the motion to strike heard before the first scheduled day of trial—December 1, 2009. The better practice would have been for Richards, upon learning of the State's opposition to his late witness disclosure, to seek a prompt hearing, so that the issues could have been resolved before potential jurors and witnesses had been summoned.

(providing that "[a]ll criminal cases must be brought to trial within one year after the defendant's initial arraignment pursuant to rule 2.8 unless an extension is granted by the court, upon a showing of good cause"). For example, the district court could have asked Richards to waive this deadline as a condition of allowing Miller-Jacobs to testify. *See State v. Magnuson,* 308 N.W.2d 83, 85 (Iowa 1981) ("Even though waiver is not mentioned in the rule, we find that a defendant may waive the requirement of trial within one year of arraignment.").

However, we need not determine whether the court actually erred in excluding Miller-Jacobs because any such error did not prejudice Richards. "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right . . . is affected." Iowa R. Evid. 5.103(*a*). In this case, we find that Richards' substantial rights were not affected by the exclusion of Miller-Jacobs' testimony. *See Babers*, 514 N.W.2d at 82 (declining to reverse because the defendant's substantial rights were not prejudiced by the exclusion of the proposed witness).

The State had a powerful case against Richards. It was essentially undisputed that someone strangled Cyd to death and then set her home on fire; the only question was whether Richards did it. Richards admitted he was with Cyd at her house about an hour before her lifeless body was found. Richards had scratch marks on his face and hands, for which he gave contradictory and implausible explanations. Cyd's fingernails had blood underneath them, which matched Richards' DNA. The blood on Cyd's t-shirt came from both herself and Richards. Gas cans and a Gatorade bottle with a gasoline residue were found on the porch of Richards' apartment, as well as a fire starter in his car. Richards decided to make a special washing only of the clothes he was

wearing at the time he last saw Cyd. Richards mentioned the activities of a noted arsonist to the police before anyone else knew the fire had been intentionally set or Cyd had been the victim of a homicide.

In this context, we do not believe Richards' rights were "injuriously affected" by the failure to admit Miller-Jacobs' testimony. *See State v. Newell*, 710 N.W.2d 6, 19 (Iowa 2006) ("To determine whether the error is harmless we ask: Does it sufficiently appear that the rights of the complaining party have been injuriously affected by the error or that he has suffered a miscarriage of justice?" (citation and internal quotation marks omitted)). Miller-Jacobs examined Richards over ten months after the events in question. Miller-Jacobs' testimony, even if believed, did not preclude Richards' having strangled Cyd to death. Miller-Jacobs did not testify that Richards was incapable of strangling someone. The jury also could have concluded that Richards was not using his full strength to grip the dynamometer. There was no evidence that Richards had any prior medical issues with his hands. There was considerable testimony as to Richards' overall fitness. The DVDs of Richards' two police interviews would have conveyed to the jury the impression of someone in good physical condition; in addition to walking around with ease, he is seen twisting the top of his water bottle on and off repeatedly, almost as a nervous habit. Moreover, Richards worked in a car parts store and by his own admission spent a lot of time changing car batteries and wiper blades, activity that would have involved gripping with his hands. In fact, he claimed to have gotten the scratches on his hands that day from changing batteries. In light of all the evidence, we conclude any error in excluding Miller-Jacobs' testimony was harmless.[2]

---

[2]In a paragraph of his main brief, Richards states that he had a constitutional right to present a defense. *See Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923, 18 L. Ed. 2d 1019, 1023 (1967); *State v. Peterson*, 532 N.W.2d 813, 816 (Iowa Ct.

**B. "Bad Acts" Evidence.** This brings us to Richards' second issue—the alleged "bad acts" testimony relating to alcohol abuse, domestic violence, and Richards' statement to his neighbor, "I think I'll just kill her."

We will start with the last of these items. In a second-degree murder case, we do not see any problem in admitting the defendant's statement two days before the victim's death that the defendant intended to kill her. *See State v. White*, 530 N.W.2d 77, 83–84 (Iowa Ct. App. 1994) (holding in a murder prosecution, the defendant's statement two days before the murders that "[a] real man that uses a gun wasn't afraid to kill" does not fall within rule 5.404(b)).

We turn now to the alcohol-related evidence. As noted, evidence was presented at trial that suggested Richards had a drinking problem and that Cyd was concerned about that problem and wanted him to give up drinking. Perhaps the most damaging evidence in this area consisted of Richards' statements in the recorded interviews. In the first interview, Richards said he resumed drinking two days before Cyd's death. In the second one, he changed his story and said he resumed drinking after she died.

But as the trial progressed, the State did not develop the alcohol theme significantly. In the sixty pages of closing argument by the State, there is no mention of Richards' drinking. The State appears to have moved away from this subject because of a lack of proof linking Richards'

---

App. 1995). To the extent Richards means to argue that he had some *independent* constitutional right to call Miller-Jacobs as a defense witness regardless of what rule 2.13 provides, we agree with the court of appeals that such a constitutional claim was not made below and is not preserved for appellate review. *See State v. Derby*, 800 N.W.2d 52, 60 (Iowa 2011) (" 'Issues not raised before the district court, including constitutional issues, cannot be raised for the first time on appeal.' " (quoting *State v. Mitchell*, 757 N.W.2d 431, 435 (Iowa 2008))).

drinking to specific conduct. This does not mean, however, that Richards' drinking was irrelevant. A jury could have found that Cyd's pressuring Richards to stop drinking was a source of friction between the two of them. Indeed, from the recorded interviews, despite Richards' claims of a peaceful disposition and deep affection for Cyd, some statements emerge that indicate Richards' hostility and resentment toward her.

Although the evidence that Richards killed Cyd was strong, it certainly was in the State's interest to present evidence of a motive—that is, a reason why Richards would have killed his ex-wife to whom he had recently become reengaged. The conflict over his alcohol use was one such reason.[3] *See* Iowa R. Evid. 5.404(*b*) (stating that "[e]vidence of other crimes, wrongs, or acts . . . may . . . be admissible for other purposes, such as proof of motive"); *State v. Duncan,* 710 N.W.2d 34, 40 (Iowa 2006) ("The key to whether evidence of other crimes, wrongs, or acts is admissible is whether such evidence " 'is relevant and material to some legitimate issue other than a general propensity to commit wrongful acts.' " (quoting *State v. Plaster,* 424 N.W.2d 226, 229) (Iowa 1988))). Hence, the evidence of Richards' drinking and Cyd's opposition to that drinking was relevant.

Having determined the evidence was relevant, we now must decide whether the danger of unfair prejudice substantially outweighed the probative value. *See* Iowa R. Evid. 5.403; *Duncan,* 710 N.W.2d at 40; *see*

---

[3]Richards argues that the State's purpose was to show he became "mean and violent" when he drank. As we read the transcript, that was not the State's theory as the case unfolded. The State did not attempt to show that Richards had been drinking immediately before the murder occurred. The State tried to prove, rather, that Richards was a controlling person toward Cyd and deeply resented any effort by her to try to affect his behavior, including his drinking. This was a valid noncharacter theory of relevance. *See State v. Elliott,* 806 N.W.2d 660, 675 (Iowa 2011).

*also State v. Sullivan*, 679 N.W.2d 19, 25 (Iowa 2004) (holding that courts should employ a two-step analysis to determine whether the bad acts evidence is admissible, and after determining the evidence is relevant and material to a legitimate factual issue in dispute other than a general propensity to commit wrongful acts, the court must then decide if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant). We find the danger of unfair prejudice did not outweigh the probative value.

The defense overstates the matter when it contends, "The social stigma attached to alcoholism makes this evidence highly prejudicial." This was a murder prosecution. According to the Iowa Department of Public Safety's statistics, only 39 murders were committed in Iowa in 2009. *See Iowa Department of Public Safety, 2009 Iowa Uniform Crime Report, available at* http://www.dps.state.ia.us/commis/ucr/2009/2009_UCR_Murder.pdf. Alcoholism, on the other hand, is an everyday occurrence. When the question is whether the defendant committed a brutal murder, the prejudicial effect of evidence that the defendant may have a drinking problem amounts to a mere drop in the bucket. *See State v. Lee*, 501 S.E.2d 334, 340 (N.C. 1998) (finding the prejudice from evidence that the defendant drank alcohol and smoked pot to be "inconsequential" in the context of a murder prosecution). Evidence that an otherwise innocent person may have had a drinking problem would not normally incline a jury to think less of his or her character and therefore to find him or her guilty of murder. Thus, no error was committed when the district court admitted evidence of Richards' prior alcohol use.

We now turn to Richards' acts of domestic violence against Cyd and her fears for her safety. Significantly, the trial judge excluded the

older incidents.[4]  For the most part, the events that the jury heard about occurred within a year of Cyd's death: Garrison's testimony that Richards talked about pushing and shoving during the six months to a year before Cyd's death; Garrison's testimony that on January 4, 2009, Richards spoke to him about a confrontation where Cyd had wanted to leave and he refused to let her do so; testimony from both Cyd's landlord and her sister that Cyd feared Richards and wanted to get away from him when she moved in early 2008; and testimony from Cyd's daughter about an incident where Richards put a cane to Cyd's neck.

We believe the evidence that Richards physically abused Cyd during the year before her death was relevant and probative.  As we have said, "The most obvious example of the legitimate use of prior-bad-acts evidence is the admission of evidence of a defendant's prior assaults of a

---

[4]This included evidence that Richards drilled holes in the floor of his apartment to spy on Cyd when she lived in the apartment below him.

The district court's approach to the bad acts evidence was a model of caution. As the court explained during the early stages of the trial:

> I agree there's a balancing test that I have to do for the prior bad acts.  The testimony about—eyewitness testimony about what they saw take place or what they heard take place and the foundation will have to be laid for each of those individual's testimony for me to be able to conduct that balancing test to determine whether those specific acts of alleged bad behavior can be testified to or not.

> And we'll have to wait and see what each one of them says about what they saw, when they saw it, what they observed, for me to be able to determine if it meets that balancing test or not.

Before admitting evidence of specific acts, the district court required each incident to be "relatively current to . . . the events that took place on January 4, 2009." The court also required that the evidence show Richards' "malice" toward Cyd rather than a propensity to commit bad acts.  Additionally, the district court considered the "strength of the witness or evidence on the relevant issue."  Thus, when the district court admitted the landlord's testimony about Cyd's statements regarding her fear of Richards, the court specifically found that it was "not too remote" (i.e., within nine months of the murder) and that it was relevant to show Richards and Cyd's relationship.  In the same ruling, the district court excluded evidence that Cyd had also made statements to her landlord fearing for her daughter's safety.

victim in a prosecution of the defendant for the subsequent murder of the victim." *State v. Taylor*, 689 N.W.2d 116, 125 (Iowa 2004).

> [T]here is a logical connection between a defendant's intent at the time of a crime, when the crime involves a person to whom he has an emotional attachment, and how the defendant has reacted to disappointment or anger directed at that person in the past, including acts of violence, rage, and physical control.

*Id.* Richards' past acts of violence toward Cyd "reveal[] the emotional relationship between the defendant and the victim and [are] highly probative of the defendant's probable motivation and intent in subsequent situations." *Id.* Domestic violence rarely involves "a single isolated incident. Rather, domestic violence is a pattern of behavior, with each episode connected to the others." *Id.* at 129 n.6 (citation and internal quotation marks omitted).

Richards admitted in the recorded interviews that he had gone to Cyd's house on January 4 and there had been a verbal dispute. What Richards denied was that he had strangled her or assaulted her in any fashion. The earlier incidents were relevant to show Richards had been angry enough at Cyd in the recent past to commit acts of violence against her. The State's thesis was not that Richards was a violent man generally, but rather that he was explosive toward Cyd specifically in the time period leading up to her untimely death.

As with Richards' drinking, we need to consider whether the probative value of the domestic abuse evidence was substantially outweighed by the danger of unfair prejudice. As we have noted, although the murderer's intent was not seriously contested, the identity of the murderer was, so it behooved the State to establish that Richards had a motive for murdering Cyd. The history of abuse helped the State do so, by showing that Richards wanted to control his ex-wife and, when

he felt himself unable to do so, could become hostile and violent toward her.

Almost directly on point is our decision in *State v. O'Connell*, 275 N.W.2d 197 (Iowa 1979), a double murder case. The defendant there was alleged to have strangled his wife to death and then set the family home on fire, resulting in the death of their child. *Id.* at 199. The defendant argued that evidence of his prior assaults on his wife, her fear of him, and the general state of their relationship should not be admitted at trial. *Id.* at 201. The district court, however, allowed this evidence to be introduced as to incidents that occurred after the parties' marriage, approximately one year before the deaths. *Id.* On appeal, we upheld this ruling:

> In this trial the crucial factual issue was the identity of the person who strangled Carole. Defendant's prior assaults on her are relevant. They also tend to prove intent. Nor was the evidence so unduly prejudicial that trial court abused its discretion in admitting this relevant evidence.
>
> The evidence of quarreling, defendant's hostility, and Carole's fears was also relevant. To prove murder the State had to prove malice aforethought. Because this element constitutes a state of mind, a prosecutor in a murder case may show prior relations between the accused and the alleged victim, as bearing on accused's Quo animo.

*Id.* at 202.

Similarly, in *Newell*, a case in which the defendant was charged with murdering his live-in girlfriend, we held that the following prior bad acts were admissible:

> he called the victim derogatory names, he head-butted her, he inflicted bruises on her arms, he listened to her phone conversation with her estranged husband, he would not let her go anywhere alone with the baby, and he kept Gillen on a timetable.

710 N.W.2d 6, 14, 21 (Iowa 2006). We explained our reasoning as follows:

> We think the evidence challenged here was highly relevant to the issue of malice aforethought because it showed the relationship between the defendant and the victim and was pertinent to the defendant's possible motive for beating and strangling Gillen. If Newell and Gillen had an acrimonious relationship, it is more probable that Newell acted with malice—a fixed purpose to do harm—at the time of Gillen's death than if they had a loving relationship. Similarly, if Newell was possessive and controlling of Gillen, it is more likely that he acted with a fixed purpose to do physical harm to her when she returned home after an inordinately long and unexplained absence.

*Id.* at 21.

Richards argues his case is distinguishable because he "did not make his intent or state of mind a contested issue." But this parses his defense too narrowly. Richards' denials that he was the perpetrator put at issue all the elements of the offense. Evidence of Richards' malevolent intent toward Cyd helped to establish he was the murderer.

Richards also argues that some of the bad acts evidence amounted to inadmissible hearsay. He points to Furman's testimony that Cyd insisted on keeping secret the place to which she was moving because "she was afraid because of the abuse she had been experiencing at her current location." Richards further points to the testimony of Cyd's daughter regarding the incident when Cyd told her Richards had "put a cane to her neck and . . . that was the last straw . . . she wanted to find somewhere else to live." We disagree with Richards' contentions.

As the trial court found, Cyd's out-of-court statements to Furman and her daughter that she was afraid of Richards and wanted to find somewhere else to live were admissible under the hearsay rule exception for statements relating to a "[t]hen existing mental, emotional, or

physical condition." *See* Iowa R. Evid. 5.803(3); *Newell*, 710 N.W.2d at 18–19 (finding admissible under the Rule 5.803(3) exception a murder victim's statements that she feared for her safety and planned to leave the defendant).

Furthermore, when Cyd told her daughter that Richards had put a cane to her neck, Cyd had just come down the steps and "was upset and crying" and her "neck was red." Hence, as the district court found, this particular statement was admissible under the excited utterance exception to the hearsay rule. *See* Iowa R. Evid. 5.803(2) (defining an excited utterance as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"); *State v. Harper*, 770 N.W.2d 316, 319–20 (Iowa 2009) (discussing this exception).

Lastly, to the extent Cyd's statement to Furman referencing "the abuse" she had been suffering should not have been admitted because it was hearsay, any error was harmless. There was plenty of nonhearsay evidence that Richards abused Cyd. *See Newell*, 710 N.W.2d at 19 (holding that "erroneously admitted hearsay will not be considered prejudicial if substantially the same evidence is properly in the record").

For all these reasons, we reject Richards' arguments that the admission of bad acts evidence necessitates a new trial.

**C. The Arguments in Richards' Pro Se Brief.** Richards also has filed a pro se appellate brief. In large part, this brief recites a narrative of what Richards now contends happened on January 4, 2009. That version does not help Richards, not only because it lacks record citations, but also because it differs in significant ways from the explanations Richards gave police in his two recorded interviews.

Following these assertions of fact, Richards provides eleven numbered paragraphs in his pro se brief urging why the evidence against him was insufficient to sustain his convictions. For the reasons already stated, we disagree with Richards: the evidence amply supports his convictions.

Finally, in a single paragraph at the end of his pro se brief, Richards maintains his trial counsel was ineffective. We preserve these undeveloped assertions of ineffective assistance for possible postconviction relief proceedings.

**IV. Conclusion.**

For the reasons stated, we vacate the decision of the court of appeals and affirm Richards' convictions and sentence.

**COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Appel. J., who concurs specially.

**APPEL, Justice (concurring specially).**

I join the thorough opinion of the court in this case, but write separately to emphasize the narrowness of the court's holding. Ordinarily, I would be highly skeptical of the exclusion of relevant expert testimony offered by the defense when the expert was designated one day late unless all alternatives had been exhausted. This case, however, is an unusual case in two respects. First, the proffered testimony of the expert was extraordinarily weak. Second, the evidence of the defendant's guilt was overwhelming. Because of the confluence of these two features, I am convinced that a retrial would be a waste of time and resources and that substantial justice has been done in this case. I am therefore able to concur with the court's opinion.