**IN THE COURT OF APPEALS OF IOWA**

No. 19-1309
Filed January 21, 2021

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**NICKOLAS PETTINGER,**
      Defendant-Appellant.
_____

      Appeal from the Iowa District Court for Polk County, Jeffrey Farrell, Judge.


      Nickolas Pettinger appeals his conviction and sentence for murder in the first degree.  **AFFIRMED.**


      Martha J. Lucey, State Appellate Defender, and Robert P. Ranschau, Assistant Appellate Defender, for appellant.

      Thomas J. Miller, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.


      Considered by Bower, C.J., and Vaitheswaran and Greer, JJ.

**BOWER, Chief Judge.**

Nickolas Pettinger appeals his conviction and sentence for murder in the first degree, in violation of Iowa Code sections 707.1 and 707.2(1)(a) (2016). Pettinger asserts (1) the trial court abused its discretion in allowing a witness to testify about two prior instances of his assaultive behavior against the decedent, (2) the verdict is against the weight of the evidence, and (3) a sentence of life without parole is unconstitutional because the jury was not required to determine whether he was an adult at the time of the killing. Finding no abuse of discretion or error of law, we affirm.

**I. Background Facts.**

Pettinger and K.G. had been dating for about four months and, at times, used methamphetamine together. K.G.'s parents were trying to help them get off methamphetamine and allowed K.G. and Pettinger to live in their basement.

On December 11, 2016, K.G.'s parents returned home after a weekend away and found the house in disarray. K.G. and Pettinger were there. K.G. refused to tell her parents what had happened to the house because she "didn't want to be a snitch." Her parents told Pettinger they were going to call the police and told him he needed to leave. Pettinger did leave. K.G. went into the basement and later came back upstairs, gave her parents a hug, and left the house.

The police arrived at K.G.'s parents' house about 8:00 p.m. and left before 9:00 p.m. About half an hour later, K.G.'s father went to a store to purchase new locks for the house. He returned home and realized he could not find any of his tools, so he drove to another store to purchase some tools to install the locks. He arrived at a Walgreen's after 10:00 p.m. and saw Pettinger there. He asked where

K.G. was, and Pettinger told him she was hiding in the back of the store because she did not want to see her father. Pettinger stated they were waiting on his brother to pick them up. K.G.'s father told Pettinger to keep K.G. safe, got the tools he needed, and left the store at about 11:00 p.m.

Andrew Comegys lived with his mother in a house detached from a large garage. Comegys is a mechanic and works on cars after hours in the garage and often allowed people to stop by and "hang out." The garage was heated, and a portion of the garage was separated by tarps hanging from the ceiling. In the tarped portion there was a computer, desk, and chairs. Comegys is a self-described methamphetamine addict and acknowledges having been convicted as a habitual offender. He knew Pettinger and had met K.G. on a few occasions.

Pettinger and K.G. arrived at Comegys's garage "with an armload of bags" early December 12 and knocked on the door. Comegys allowed them to come into the garage and the three spent the rest of the night in the garage talking or using the computer. Comegys testified he remembered no one else being at the garage that night. At some point the three smoked methamphetamine together. After 3:00 a.m., Pettinger and K.G. asked if they could go into the house to use the bathroom. Comegys agreed, and the two went into the house for about forty-five minutes. When they returned to the garage, Pettinger and K.G. were arguing. Comegys told the two to quiet down. At about 6:30 or 7:00 a.m., Comegys went into the house to check on his mother and nephew, for whom his mother provided daycare. His mother complained about the noise the visitors made while in the bathroom.

Comegys returned to the garage about twenty to thirty minutes later and heard "[a] thumping noise" and then saw Pettinger straddling [K.G.], who was on the floor, striking down at her." Comegys "hollered at him to stop." Comegys saw blood on the floor and "freaked." He left the garage, tried to gather himself, and went to tell his mother what was happening. Comegys went back out to the garage, saw Pettinger pacing back and forth and repeating, "Everything's going to be all right." Comegys locked the garage door and then returned to the house and called 911.

Two deputies arrived, and Comegys gave them the key to the garage and permission to enter the garage. They knocked on the garage and announced themselves as sheriff's deputies. Pettinger was "very agitated, excited, nervous"; blocked the door using his foot; and demanded to see a warrant. The deputies explained that they were there on a call about an assault and they had the owner's permission to enter. Pettinger told the deputies that K.G. was not there and "may have gone in the house." One of the deputies forced the door open, and Pettinger bolted, pushing the other deputy out of the way. Comegys saw Pettinger "come flying out and running down the driveway through the ditch up to the street and down toward the corner." Both deputies chased Pettinger, but they lost him as he ran through the neighborhood. A search ensued that lasted about ninety minutes, ending when a woman ran out of her house waving her arms. She said someone was hiding in her garage. The deputies entered the garage and found Pettinger. As Pettinger was being handcuffed he volunteered, "You know I didn't do that." The deputy asked, "Do what?" Pettinger stated, "She was like that when I found

her." Pettinger had blood on his pants and hands. The Iowa Department of Criminal Investigations (DCI) later confirmed the blood was K.G.'s.

Back in Comegys's garage, K.G. was found lying on the ground with head wounds and blood pooled around her head. Police began chest compressions when they found no pulse. Emergency medical responders were unable to revive her.

DCI detectives later processed the scene in the garage and found a hammer wrapped in a jacket, a bead breaker,[1] and a twenty-pound dumbbell—all with blood on them. The detectives also found an unscrewed window cleaner bottle with what appeared to be blood transfer and blood stains on it and an ashtray and glass pipe that also appeared to have blood on them. Later testing determined the blood on the hammer, bead breaker, dumbbell, and window cleaner bottle was K.G.'s. In a white plastic bag found a distance away from the body, the detectives found a HDMI cord with hair and apparent blood on it, four blue rags with stains, a bracelet similar to others on K.G.'s right arm, an XL black jacket with blood on it, black gloves, brown socks, and a zip-up hoodie. Later testing found the blood present on the white plastic bag was K.G.'s.

Comegys's computer was analyzed—only three people logged into their social media sites from the computer between midnight on December 11 and 7:00 a.m. on December 12—Comegys, Pettinger, and K.G.

An autopsy revealed K.G. suffered "multiple blunt force injuries, the cause of death being blunt force cranial cerebral trauma." At least one wound on her

---

[1] A bead breaker is "big metal item used to help put tires on cars."

forehead was consistent with the twenty-pound dumbbell found in the garage. There was also a ligature mark on K.G.'s neck, which the coroner testified was not the cause of death but occurred about the same time. There were finger-shaped bruises on K.G.'s left arm. The coroner testified injuries on her hands appeared to be defensive in nature.

Pettinger was charged with first-degree murder. In a motion in limine, the defense argued K.G.'s parents should not be allowed to testify about prior incidents of domestic violence between Pettinger and K.G. During an offer of proof, K.G.'s mother testified about two incidents:

> There was one night in particular we were upstairs having some conversations, and [K.G.] went downstairs. And then Nick and I and his friend were still upstairs talking, and then a few minutes later in the middle of a sentence, Nick runs downstairs really fast. And next thing we know, we hear [K.G.] screaming, "Get off me. Get off me. Get off me." And her friend and I run downstairs, and he is on top of her like in a bear position, on top of her holding her down. And we get him off of her, and I told [K.G.] to go upstairs, and Nick told me that he was upset because [K.G.] chose me over him.
> 	Q. Chose you over him. Can you explain any further what the context of that comment was? A. He asked [K.G.]—he told me that he asked [K.G.] if he could smoke a cigarette in the basement, and she said, "No, because my mom doesn't allow that."

She described the next incident:

> There was one time where I heard some commotion downstairs, screaming and yelling. I went downstairs and he had just thrown some water on her. They were up against the wall, and he told me he did that because she was going to—a friend had called, and she was wanting to go help that friend.
> 	Q. Okay. What room of the house was this in? A. The basement.
> 	Q. Where had you been? A. I was upstairs in the main level.
> 	Q. On the main floor or upstairs? A. Sorry. The main level.
> 	Q. The main level. What did you hear? A. Screaming and yelling.
> 	. . . .

Q. And, again, what did you observe when you went downstairs? A. When I went downstairs, they were off in the corner. He had her backed up against the wall, and he had just thrown a cup of water on her.

Q. How could you tell that he had thrown a cup of water on her? A. She was all wet, and he said he did it.

Q. When you say he had her up against the wall, would you describe more specifically what their postures were? A. They were face-to-face. Her back was towards the wall, and they were face-to-face.

The court ruled the information was relevant to intent, identity, and motive and "beyond that":

Domestic assault is the context in which we were looking at these in which the case law has looked at these things. But it's really the course of conduct, and the actions that the State is claiming as relevant to the issue of intent and identity and motive, and so it doesn't have to meet the elements of being a domestic assault. It can just be evidence that would be relevant to put into context this relationship and those concerns.

So I believe the State has done that. The witness is an eyewitness to this conduct that she's testified to. She either heard or personally witnessed. She heard admissions made by the defendant. That will meet the clear proof prong of this test that I need to consider. So I believe this evidence can come in.

At trial, the State presented witnesses who supported the facts as laid out above. The defense argued the evidence was insufficient to establish Pettinger was K.G.'s assailant and suggested Comegys was the perpetrator. The defense called two witnesses. Grady Trumbo testified that he was at Comegys's garage the early morning hours of December 12, as was "some guy, I don't know his name, and Anthony Six and Nick and some gal he was with." Trumbo testified he and Six were working on Six's truck tires in the driveway and Trumbo went into the garage, but "not for . . . a long period of time." He testified Comegys was in the house. Trumbo also stated he left at about 3:00 or 4:00 in the morning with the unknown man and Six. When they left, K.G. and Pettinger were alone in garage.

Pettinger's brother, Isaac,[2] testified that he picked up Pettinger and K.G. from Walgreen's between 9:30 and 10:30 p.m. on December 11, 2016, they drove to several destinations, and he had dropped the two off at Comegys's about midnight.

A jury found Pettinger guilty of first-degree murder. He now appeals, challenging the admission of prior bad-acts testimony by K.G.'s mother, the denial of his motion for new trial on grounds the verdict was against the weight of the evidence, and claiming his life-without-parole sentence is unconstitutional because the jury did not find he was older than eighteen years of age.

## II. Prior Bad Acts Evidence.

This court reviews "evidentiary rulings regarding the admission or exclusion of prior bad acts for abuse of discretion." *State v. Veal*, 930 N.W.2d 319, 328 (Iowa 2019). An abuse of discretion occurs when "a court acts on grounds clearly untenable or to an extent clearly unreasonable." *Id.* at 328–29 (citation omitted). "If an abuse of discretion occurred, reversal will not be warranted if error was harmless." *State v. Richards*, 879 N.W.2d 140, 145 (Iowa 2016) (citation omitted).

Our rules of evidence provide "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Iowa R. Evid. 5.404(b)(1). However, evidence of a crime, wrong, or other act, "may be admissible for another purpose such as proving motive, opportunity, intent,

---

[2] Isaac testified he was thirty-one years old and the defendant was two years older.

preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Iowa R. Evid. 5.404(b)(2).

Our supreme court has set out a three-step analysis to determine whether prior-bad-acts evidence is admissible under rule 5.404(b)(2):

> (1) "the evidence must be relevant and material to a *legitimate* issue in the case other than a general propensity to commit wrongful acts"; (2) "there must be clear proof the individual against whom the evidence is offered committed the bad act or crime"; and (3) if the first two prongs are satisfied, "the court must then decide if [the evidence's] probative value is substantially outweighed by the danger of unfair prejudice to the defendant."

*Richards*, 879 N.W.2d at 145 (alteration and emphasis in original) (citation omitted).

The district court found the prior acts were relevant to intent, motive, and identity; were shown by clear proof; and did not substantially outweigh the danger of unfair prejudice. We find no abuse of discretion in the court's ruling. *See id.* at 147–53; *State v. Rodriquez,* 636 N.W.2d 234, 242 (Iowa 2001) (concluding prior occasions of abuse against defendant's girlfriend were relevant to the defendant's intent because evidence of "prior intentional, violent acts towards the victim" made it "more probable that [the defendant] intended to cause [the victim] serious injury" on the day of the assault for which he was being tried); *State v. Richards*, 809 N.W.2d 80, 93–94 (Iowa 2012) (concluding evidence about the defendant pushing and shoving the victim and putting a cane to her neck was "relevant to show [the defendant] had been angry enough at [the victim] in the recent past to commit acts of violence against her").

### III. Motion for New Trial.

Pettinger contends the district court abused its discretion in denying his motion for new trial, asserting the verdict was contrary to the weight of the evidence. We review weight-of-the-evidence challenges for abuse of discretion. *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016).

"The weight-of-the-evidence standard requires the district court to consider whether more 'credible evidence' supports the verdict rendered than supports the alternative verdict." *Id.* "A district court should grant a motion for a new trial only in exceptional circumstances." *Id.* at 705. We review whether the district court abused its discretion in answering "whether 'a greater amount of credible evidence' suggests the verdict rendered was a miscarriage of justice." *Id.* at 706 (quoting *State v. Ellis,* 578 N.W.2d 655, 658–59 (Iowa 1998)).

Here, the district court denied the motion for new trial stating, "[T]he overwhelming weight of the credible evidence submitted at the trial, shows that Mr. Pettinger was, in fact, guilty of the crime of first degree murder." The court specifically noted:

> There was an eyewitness who saw the defendant beating the victim. Law enforcement was called. Mr. Pettinger was found locked in the garage with victim. He wouldn't let officers in. He told them they had to have a warrant.
>      At one point in time he said there was no one else in the garage other than himself. He then fled the scene and was later found in a neighbor's garage with blood on his hands and blood on his pants. And that alone with all the other evidence that was presented during the course of trial showed overwhelming indications of his guilt.

We find no abuse of discretion in the court's denial of a new trial. This is not an exceptional case that would warrant a new trial.

**IV. Lack of Jury finding on Pettinger's Age.**

Constitutional claims are reviewed de novo. *State v. Heard*, 934 N.W.2d 433, 439 (Iowa 2019). Pettinger's constitutional claim is premised on the holding in *Apprendi v. New Jersey*, that due process and associated jury protections entitle a criminal defendant to "a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." 530 U.S. 466, 477–78 (2000) (citation omitted); *see also Alleyne v. United States*, 570 U.S. 99, 103 (2013) ("Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt."). He asserts the jury was required to find he was older than eighteen years of age because a life-without-parole sentence for a juvenile has been determined to be unconstitutional. *See State v. Sweet*, 879 N.W.2d 811, 839 (Iowa 2016).

Our supreme court has addressed this issue recently,[3]

> We assume without deciding that when a defendant's age is *genuinely in dispute*, a jury finding that he or she is eighteen or older should be required before imposing a life-without-parole sentence. But the defendant *must raise the issue of his age and claim to be a minor before the issue must be submitted to the jury*. Heard failed to do so. Understandably so because he had already acknowledged in his own court filing that he was an adult at the time of Hutchinson's murder.

*Heard*, 934 N.W.2d at 446 (emphasis added). Because Heard had not raised the issue at trial, our supreme court concluded the issue was not properly preserved. *Id.* at 445.

---

[3] We recognize Pettinger did not have the benefit of the *Heard* decision as it was decided after Pettinger's trial occurred.

Like Heard, Pettinger did not raise his age as an issue to be decided by the jury.[4]  *See id.* at 446.  And like Heard, this is not surprising because Pettinger's age is not genuinely in dispute.  *See id.*  Pettinger does not claim to be a minor, and his brother Isaac testified Pettinger was two years older than he was and Isaac was thirty-one years of age.  We need not address the claim of error further.  We affirm the conviction and sentence.

**AFFIRMED.**

---

[4] The *Heard* court also concluded the claim is not a claim of an illegal sentence, which can be raised at any time.  934 N.W.2d at 446.  Rather, "In our view, a defendant, at most, can claim a procedural error if an issue as to his age was not submitted to the jury."  *Id.*