**IN THE COURT OF APPEALS OF IOWA**

No. 15-1829
Filed October 26, 2016

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**TYRONE R. WASHINGTON, JR.,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Worth County, Colleen D. Weiland, Judge.

The defendant appeals from his conviction for first-degree murder. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Patricia A. Reynolds, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Heard by Vaitheswaran, P.J., and Potterfield and Bower, JJ.

**POTTERFIELD, Judge.**

Tyrone Washington Jr. appeals from his conviction for first-degree murder. Washington maintains there was insufficient evidence to support his conviction for murder in the first degree,[1] and he claims the district court abused its discretion in denying his weight-of-the-evidence challenge. He also claims trial counsel was ineffective for failing to object to the admission of prior-bad-acts evidence and for failing to introduce evidence of a text message sent to him by the decedent. Last, he challenges the district court's denial of his motion to strike the second jury panel.

**I. Background Facts and Proceedings.**

On August 19, 2013, Washington was charged by trial information with murder in the first degree in the death of Justina Smith. Washington entered a plea of not guilty and gave notice he would claim self-defense.

The trial was initially set to begin on May 12, 2015.

On May 5, 2015, Washington filed a motion to strike the jury panel, arguing there was "a material departure from the statutory requirements" and "a violation of the defendant's rights under the 6th and 14th Amendments of the Constitution." In his motion, Washington noted that of the 137 potential jurors who had returned responses, zero had indicated they were African-American. Washington urged that the underrepresentation was "systemic and resulting in prejudice to the defendant's right to a jury made up of a 'fair cross-section' of the community."

---

[1] Alternatively, Washington argues that there was insufficient evidence to support any of the lesser-included offenses except voluntary manslaughter.

A hearing was held on Washington's motion. At the hearing, the clerk of court and other employees from the clerk's office testified about the process used to empanel a jury, which started with groups of names of possible jurors from the county from the master list of names compiled by court administration in Des Moines. One of the employees testified that she and her coworkers were the people who excused jurors. When she was asked if the requests to be excused were "brought in front of a judge for them to decide on the deferral or the excuse," she stated, "No." She later clarified that some are brought in front of a judge.

On May 14, the court granted Washington's motion and discharged the panel. In its order, the court noted that of the 117 questionnaires submitted and the ninety-five panel members checked in, "there was no person of African-American, black, mixed racial, or other non-white origin" except one person who identified themselves as white and Native American. The court went on to state, "From a population that is approximately 4% African-American and 10% non-white [overall], that result could arise from standard deviation. But the sample pools previously presented by the defendant show that underrepresentation is consistent." Although the court did not find an action or inaction meant to exclude racial minorities, the court found there was "sufficient departure from statutory requirements and sufficient resulting prejudice to find the departure to be material."

A second jury panel was summoned on July 7, and Washington again moved to strike the panel. The court denied the motion, finding that of the 224 people that responded to the jury questionnaire, four had identified themselves

as African-American—1.8% of the possible panel members. The court noted the changed practices of the county's clerk of court since the first jury was empaneled, including "increased follow up at the undeliverable and non-responded stages of the jury process" and allowing excuses only at "specific judicial direction or by a judge." The court found that the material departures from the statute had been sufficiently cured, and although African-Americans were underrepresented, Washington had not proved that it was the result of systematic exclusion.

Washington's jury trial began the same day. At the trial, Deputy Dennis Paulsen testified without objection that he first had contact with Smith and Washington in his capacity as a police officer on July 6, 2013, when he was called to Smith's apartment for a "domestic in progress." When he arrived, Washington told him that they had been fighting and both parties had shoved each other, but that the incident was being blown out of proportion. When Deputy Paulsen spoke with Smith, she told him Washington had choked her and slammed her down on the bed. The officer testified that he saw finger marks around Smith's neck and a bump or a bruise on the side of her head that he believed corroborated her version of the events.[2] Washington was arrested for domestic abuse assault, and a no-contact order was entered preventing Smith and Washington from having contact with each other.

---

[2] Photographs of Smith were taken and were admitted as exhibits at trial; Paulsen testified that he did not believe they showed the marks as clearly as he had been able to see them in person on July 6.

Officers again were dispatched to Smith's apartment[3] on August 1 after receiving an anonymous call that someone had broken in. When officers arrived, they found Washington hiding in an upstairs bedroom closet. He told the officers that he had used his key to enter—a key which was found on his person and later returned to him—and that he was meeting Smith at her request. Because the no-contact order was still in place,[4] the officers again arrested Washington.

Tyrone Jones was with Smith on the morning of August 5, 2013. According to Jones, Smith told him they needed to go to the park to meet Washington so she could get her house key and some money that he owed her for bills. Once they got to the park, Jones stayed in Smith's car while she got out to speak to Washington. Jones testified he did not see Smith with a knife when she got out of the vehicle and he "did not know her to have [one]." Jones sat in the car for a few minutes before he wondered what was taking so long and looked back to see Smith and Washington. He saw what looked like Washington swinging at Smith and then got out to help Smith. Once he was outside of the car approaching the two, he saw that Washington had a knife in his hand. Jones stated he yelled at Washington, and Washington then made a slicing motion at Jones before running and getting in Smith's car. Once Washington was in the car, he drove towards Jones and Smith, in what Jones characterized as an attempt to run them over. Smith had fallen to the ground by this time, and Washington stopped the car, got out, and started kicking Smith. At this point,

---

[3] Washington testified that he was placed on Smith's lease, so it was also his apartment.
[4] There was testimony that Smith dropped the no-contact order at some point and then later had it reinstated. It is unclear on what dates those events occurred, but Deputy Paulsen testified that the officers verified it was in place on August 1 before arresting Washington.

Jones called 911, and Washington again got in the car and then drove away. Smith had called 911 two minutes earlier shouting, "Help me! Help me! [unintelligible] at the park!" Jones attempted to help Smith until medical personnel arrived; he testified Smith was wheezing and unable to speak.[5]

Washington led officers on a high-speed chase before they were ultimately able to stop the vehicle and take him into custody. Photographs were taken of Washington at the time he was taken into custody, showing he had some blood on his clothing, but his clothes were not cut or stretched. Once he was taken to the jail, more photographs were taken of his bare hands and chest, showing that he had no injuries to his person, except one nick on his hand that may have been a scar. These photographs were admitted into evidence and shown to the jury.

A DNA analyst from the department of criminal investigations testified that of all the blood spots tested on Washington's clothing and the knife, which was recovered from the scene, only Smith's blood was found.

The medical examiner who performed the autopsy testified Smith had sustained twelve "sharp force" injuries involving her head, chest, abdomen, upper arms, lower legs, and both hands. Only two of the wounds were stab wounds[6]; one in the upper chest that went into her heart and lungs, and one in her upper abdomen that went into her liver. Each of the two stabs wounds was potentially fatal. Additionally, Smith had sustained blunt force injuries to her face and head, and her nose was broken. The medical examiner described a cut on one of

---

[5] Smith was later pronounced dead at the local hospital.
[6] According to the medical examiner, a stab wound is a wound that is deeper than it is long, while an incised wound is the opposite.

Smith's hands as consistent with a defensive wound. He testified the other wounds may have also been defensive but they were not "classic."

Washington testified in his own defense; he stated that he went to the park to meet Smith at her request. When he got there, he told Smith he no longer wanted to be in a relationship with her and asked her for money she owed him. According to Washington, Smith then charged him with a knife that she had in the front pocket of the sweatshirt she was wearing. At some point, Washington was able to get the knife from Smith's hand, but she continued to charge at him, so he kept swinging the knife at her. Washington stated Jones then got out of the car and held him around the midsection, leaving Washington "sandwiched" in a two-on-one fight. During this ongoing struggle, Washington fell on top of Smith and she was stabbed as a result. Washington left in Smith's car because he panicked; he stated, "I felt at the time they weren't going to believe me because they didn't believe me before the incident that transpired with me and [Smith]." Washington denied kicking Smith in the head and said he did not know how her nose was broken. Washington did not call 911 for help.

The jury convicted of Washington of murder in the first degree. He was sentenced to life in prison without the opportunity for parole. He appeals.

**II. Standards of Review.**

We review challenges to sufficiency of the evidence for correction of errors at law. *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005).

We review a weight-of-the-evidence challenge for an abuse of discretion by the trial court. *State v. Reeves*, 670 N.W.2d 199, 203 (Iowa 2003). We do not

decide anew the underlying question of whether the verdict is against the weight of the evidence.  *Id.*

We review claims of ineffective assistance de novo.  *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006).

Insofar as Washington's challenge to the jury panel is constitutional, we review de novo.  *See State v. Chidester*, 570 N.W.2d 78, 80 (Iowa 1997).  The alleged statutory violation is reviewed for correction of errors at law.  *Id.*

## III. Discussion.

### A. Sufficiency of the Evidence.

To sustain a conviction for murder in the first degree, the State had the burden to prove each element of the crime beyond a reasonable doubt.  *See State v. Armstrong*, 787 N.W.2d 472, 475 (Iowa Ct. App. 2010).  In considering the sufficiency of the evidence, we review the evidence in the light most favorable to the State.  *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012).  In doing so, we make all reasonable inferences that may be fairly drawn from the evidence.  *Id.*

The jury was instructed Washington was guilty of murder in the first degree if it found the following:

> 1. On or about August 5, 2013, the defendant stabbed Justina Smith.
> 2. Justina Smith died as a result of being stabbed.
> 3. The defendant stabbed Justina Smith with malice aforethought.
> 4. The defendant stabbed Justina Smith willfully, deliberately, premeditatedly and with a specific intent to kill Justina Smith.
> 5. The defendant was not justified.

Washington maintains the State did not meet its burden to prove he acted with premeditation and malice aforethought. Additionally, he maintains there was insufficient evidence to overcome his defense of justification. We consider each in turn.

*1. Premeditation:* As the jury was instructed, premeditation is "to think or ponder upon a matter before acting." *See State v. Buenaventura*, 660 N.W.2d 38, 48 (Iowa 2003). "The law does not require any minimum amount of time to premeditate and a few minutes are certainly adequate." *Id.* at 49. Premeditation may be shown through evidence of any of the following: (1) activity by the defendant to plan the killing, (2) motive based on the relationship between the defendant and the victim, and (3) the nature of the killing, including use of a deadly weapon combined with an opportunity to deliberate. *Id.* at 48.

Sufficient evidence was presented for a rational factfinder to determine Washington premeditated the killing. Although Washington denied bringing the knife with him to meet Smith, the jury may have believed otherwise. *See State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006) ("Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury was free to reject certain evidence, and credit other evidence." (citation omitted)). Jones testified he did not see Smith with a knife and he did not know her to have one. *See State v. Hamilton*, 309 N.W.2d 471, 480 (Iowa 1981) (finding substantial evidence supported the jury's first-degree-murder conviction where the defendant brought the murder weapon with him to the victim's residence). Additionally, the State presented evidence that Washington had recently choked Smith and slammed her onto a bed, so there was a history of violence between the parties.

*See State v. Taylor*, 689 N.W.2d 116, 126 (Iowa 2004) ("[T]he defendant's prior conduct directed to the victim of a crime, whether loving or violent, reveals the emotional relationship between the defendant and the victim and is highly probative of the defendant's probable motivation and intent in subsequent situations.").

Whether the jury believed Washington went to the park with the intention to murder Smith or formed the intent during their discussion in the park, sufficient evidence supports the finding of premeditation.

***2. Malice Aforethought:*** Malice aforethought is a fixed purpose or design to do some physical harm to another existing prior to the act complained of. *State v. Serrato*, 787 N.W.2d 462, 469 (Iowa 2010) (citation omitted). "Our first-degree murder cases have long held that the use of a deadly weapon supports an inference of malice . . . ." *State v. Reeves*, 636 N.W.2d 22, 25 (Iowa 2001). "Because it is a state of mind, malice aforethought often evades direct evidence." *Serrato*, 787 N.W.2d at 469. "Proof of . . . malice aforethought may be accomplished by inferences made from the acts and conduct of the defendant and the means used in doing the wrongful and injurious acts." *State v. Wedebrand*, 602 N.W.2d 186, 189 (Iowa Ct. App. 1999). Considering the number of sharp-force injuries sustained by Smith and the two stab wounds, both of which may have been fatal, the jury could have reasonably concluded Washington acted with malice aforethought. Additionally, Jones's testimony that Washington left the vehicle to return to Smith and kick her while she was on the ground after the altercation supports the conclusion that Washington acted with a "fixed purpose" to harm Smith.

***3. Self-Defense:*** Because Washington raised the issue of self-defense, the State had the burden to prove beyond a reasonable doubt that his actions were not justified. *See State v. Toby Richards*, 879 N.W.2d 140, 148 (Iowa 2016). In order to do so, the State could prove any of the following:

> 1. The defendant initiated or continued the incident resulting in injury; or
> 2. The defendant did not believe he was in imminent danger of death or injury and that the use of force was not necessary to save him; or
> 3. The defendant had no reasonable grounds for such belief; or
> 4. The force used was unreasonable.

*Id.* At a minimum, there was sufficient evidence to support a conclusion that the force used by Washington was unreasonable. Even if he did not bring the knife with him and Smith initiated the attack, Washington was able to disarm her before he sustained any injuries. Rather than disengaging or throwing the weapon aside, Washington inflicted twelve sharp-force injuries that ranged from Smith's head, chest, abdomen, upper arms, lower legs, and hands. He testified that Smith continued to come at him even after he disarmed her, but the jury was able to see the state of Washington's clothes at the time of his arrest, and they did not appear to be cut or stretched—leading to the conclusion that Smith was never able to get her hands on his person. Moreover, according to the medical examiner, at least one of the wounds on Smith was a classic defensive injury. Although Washington denied causing or knowing what caused the blunt force injuries to Smith's nose and head, the jury was free to believe Washington continued to engage and kick Smith while she was on the ground, unable to stand—as Jones testified.

**B. Weight of the Evidence.**

Washington challenges the weight of the evidence, maintaining the district court abused its discretion in denying Washington's motion for new trial. Washington maintains some evidence shows "crucial State witnesses were not credible." He asserts Jones's testimony that Washington got out of the car after he began to flee was "contradicted" by the medical examiner's testimony that the injuries to Smith's face and head could have occurred during her fall or during the life-saving attempts by medical personnel. The medical examiner testified he could not say conclusively how Smith had sustained the blunt-force injuries because he had not witnessed them occur. While he stated it was possible such injuries were sustained by a fall or due to medical intervention, his testimony did not contradict that of Jones. And Jones was present at the scene; he told officers immediately after the incident that Washington had kicked Smith while she lay on the ground, and he testified similarly at trial.

Additionally, Washington maintains his high-speed flight from the scene and from chasing police officers is explained by his distrust of local police officers to treat him fairly and to fully investigate his claim of self-defense. But it could also be explained by his awareness of his guilt. *See State v. Wilson*, 878 N.W.2d 203, 211 (Iowa 2016) ("It is well-settled law that the act of avoiding law enforcement after a crime has been committed may constitute circumstantial evidence of consciousness of guilt that is probative of guilt itself.").

Washington's claim of self-defense is not supported by the physical evidence. Washington sustained no injuries, while Smith sustained several. Washington maintains Jones helped with the attack and held on to him, but

Jones was also not injured—corroborating Jones's testimony that he was able to maneuver away from Washington when Washington sliced at him with the knife. Washington claims he stabbed Smith accidentally when he fell on top of her during the scuffle, but he could not explain the second stab wound. Moreover, Smith made a desperate call to 911 shouting that she needed help at the park.

Considering the evidence in the record, the district court did not abuse its discretion in denying Washington's motion for a new trial.

**C. Ineffective Assistance.**

Washington maintains he received ineffective assistance from trial counsel. Specifically, he maintains trial counsel was ineffective for failing to object to the admission of evidence of prior bad acts and for failing to obtain and offer an exhibit showing the decedent had sent him a text message telling him to meet her in the park.

To prevail on a claim of ineffective assistance of counsel, Washington must prove by a preponderance of the evidence (1) his attorney failed to perform an essential duty and (2) prejudice resulted from the failure. *See State v. Rodriguez*, 804 N.W.2d 844, 848 (Iowa 2011). We measure counsel's performance against an objective standard of reasonableness under prevailing professional norms. *State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012). There is a presumption counsel performed competently. *Id.* Prejudice exists where the defendant proves by a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id.* at 496. We look to the cumulative effect of counsel's alleged errors to determine whether Washington satisfied his burden regarding the prejudice prong. *See id.*

at 499. His claim fails if either element is lacking. *See Everett v. State*, 789 N.W.2d 151, 159 (Iowa 2010). Although we prefer to preserve ineffective-assistance claims for development of the record, *see State v. Tate*, 710 N.W.2d 237, 240 (Iowa 2006), the record here is adequate for us to decide the claims on direct appeal.

*1. Prior-Bad-Acts Evidence.* Washington asserts trial counsel was ineffective for failing to object[7] to the State's evidence that Washington had been violent toward Smith—choking her and slamming her down on a bed—one month before her death. Washington maintains the prior-bad-acts evidence, *see* Iowa R. Evid. 5.404(b), was irrelevant and was substantially outweighed by the danger of unfair prejudice.

Washington's claim fails because the evidence he complains of would have been admitted over an objection by trial counsel. *See State v. Utter*, 803 N.W.2d 647, 652 (Iowa 2011) (stating that trial counsel has no duty to pursue a meritless issue). Prior-bad-acts evidence is relevant to "a legitimate factual issue in dispute" such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *State v. Taylor*, 689 N.W.2d 116, 123 (Iowa 2004); *see also* Iowa R. Evid. 5.404(b).

While Washington maintains evidence of the earlier violence against Smith was not relevant, "[t]he most obvious example of the legitimate use of prior-bad-acts evidence is the admission of evidence of a defendant's prior assault[] of a victim in a prosecution of the defendant for the subsequent murder

---

[7] Counsel moved in limine before trial to exclude character evidence, but the court denied the motion as a preliminary matter. Counsel did not object at trial.

of the victim." *State v. Dennis Richards*, 809 N.W.2d 80, 93 (Iowa 2012). This is true because:

> there is a logical connection between a defendant's intent at the time of a crime, when the crime involves a person to whom he has an emotional attachment, and how the defendant has reacted to disappointment or anger directed at that person in the past, including acts of violence, rage, and physical control.

*Taylor*, 689 N.W.2d at 125.

Intent was disputed at trial. By claiming self-defense, Washington "did not eliminate the relevance of intent," *see Toby Richards*, 879 N.W.2d at 153, and our case law has repeatedly reaffirmed that the State may use a defendant's prior violent action to prove the intent element of the present crime. *See, e.g.*, *Dennis Richards*, 809 N.W.2d at 93 ("Domestic violence rarely involves 'a single isolated incident. Rather, domestic violence is a pattern of behavior, with each episode connected to the other.'" (citation omitted)). While the State had an eyewitness who testified about Washington's attack of Smith, Washington challenged Jones' account of the events. Moreover, because Washington's mindset "evades direct evidence," *Serrato*, 787 N.W.2d at 469, his prior use of violence against this victim "is highly probative of the defendant's probable motivation and intent in subsequent situations." *State v. Taylor*, 689 N.W.2d at 126. (Iowa 2004).

Because it was relevant, the court would next consider whether there was clear proof Washington committed the bad act. *See Toby Richards*, 879 N.W.2d at 145. "In assessing whether there is clear proof of prior misconduct, it is not required that the prior act be established beyond a reasonable doubt, nor is corroboration necessary." *Taylor*, 689 N.W.2d at 129. Proof is sufficient if it

"prevent[s] the jury from engaging in speculation or drawing inferences based on mere suspicion." *State v. Brown*, 569 N.W.2d 113, 117 (Iowa 1997) (citation omitted). The officer's testimony about what he saw and heard after being dispatched to Smith's apartment for an "ongoing domestic," along with the photographs taken of Smith afterward and the no-contact order issued based on a court's finding of probable cause that "domestic abuse assault occurred" is sufficient to fulfil the clear-proof requirement.

Finally, the court would have considered if the prejudice arising from the evidence substantially outweighed its probative value. *See Toby Richards*, 879 N.W.2d at 145. Here, the possibility of unfair prejudice is a close call. The officer testified that Smith told him Washington had choked her and slammed her against the bed. There was a risk that the retelling of the event in this detail would sway the jury on an improper emotional basis. *See State v. Putman*, 848 N.W.2d 1, 15 (Iowa 2014) ("[C]oncerns about prejudice to a defendant might be eased by narrowing the scope of the prior-bad-acts evidence presented to the jury."); *see also State v. Rodriguez*, 636 N.W.2d 234, 243 (Iowa 2001) (finding the prejudice was minimal where the State "did not elicit great detail about the prior assaults and spent a relatively small amount of time on th[e] line of questioning"). However, "[the defendant] was not entitled to have the jury determine his guilt or innocence on a false presentation that his and the victim's relationship and their parting were peaceful and friendly." *Taylor*, 689 N.W.2d at 130 (alteration in original) (citation omitted). Additionally, we note the trial court gave the jury a limiting instruction, which advised the jurors of the appropriate use of the evidence. *See Rodriguez*, 424 N.W.2d at 243 n.2 ("Prejudice to the

defendant can be limited with the use of a cautionary instruction explaining the purpose for which the prior acts evidence may be used.").  After considering the factors outlined above, the prejudice arising from the admission of the prior-bad-acts evidence does not substantially outweigh its probative value

Because the complained-of evidence was relevant, there was clear proof Washington had committed the act, and the prejudice arising from its admission did not substantially outweigh the probative value, the district court would have admitted the evidence even if trial counsel objected.  This claim of ineffective assistance fails.

*2. Text Message.*  Washington maintains trial counsel was ineffective for not offering into evidence a text message that Smith sent him asking him to meet her in the park on August 5.

At trial, Washington testified that Smith called him on the morning of August 5, asking him to meet her in the park.  Similarly, Jones testified that Smith told him they were going to the park in order for her to meet Washington.  This does not appear to be a disputed fact—that the meeting between the two was pre-arranged—and no one at trial testified that Washington was the party who asked to meet Smith.  There is no merit to Washington's argument that trial counsel breached an essential duty by not having the duplicative evidence of the text message offered at trial.  *See* Iowa R. Evid. 5.403 ("Although relevant, evidence may be excluded . . . by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").  Washington's claim fails.

**D. Jury Panel.**

Washington challenges the district court's denial of his motion to strike the second jury panel. He argues that both his constitutional and statutory right to a jury from a fair cross-section of the population was violated. *See* U.S. Const. amend. VI.; Iowa Const. art. 1, § 10; *see also* Iowa Code § 607A.1.

***1. Statutory challenge.*** Washington maintains there was a material departure from the statutory requirements for drawing the jury. If we find a violation of Iowa Code chapter 607A, we consider whether the violation is "one of 'real importance or great consequence.'" *State v. Chidester*, 570 N.W.2d 78, 84 (Iowa 1997) (citation omitted). "[A] departure from statutory requirements is of real importance or of a great consequence only when the defendant's rights have been prejudiced." *Id.*

Washington's first complaint is that the county clerk used "only" the voter registration list and the current motor vehicle operators list. He maintains the court should have used an additional list, such as a utility list, that would reach a broader cross-section of the community. While Iowa Code subsection 607A.22(1) requires the use of the voter registration and current motor operators lists, subsection (2) *permits* the use of "any other comprehensive list of persons residing the community, including but not limited to the lists of public utility customers." *See also Wolf v. Lutheran Mut. Life Ins. Co.*, 18 N.W.2d 804, 808 (Iowa 1945) ("The word 'may', when used in a statute, is permissive only and operates to confer discretion . . . ."). Thus, the decision not to use the additional list is not a violation of Iowa Code chapter 607A.

While the clerk changed the procedure to excuse jurors between the first and second jury summons, Washington also maintains that the procedure to excuse jurors was in violation of statutory requirements. *See* Iowa Code § 607A.6 (allowing "the court" to "defer a term of grand or petit juror service upon a finding of hardship, inconvenience, or public necessity"). The clerk of court, who was also the jury manager for the county, testified about the process to get excused at the time of Washington's trial. She testified, "There are some that we were given a blanket by Judge Weiland if they had—and her and I set out the criteria for those. And anything other than that were referred to the judge." The district court ruled that it was not a material departure because the "excuses were made at specific judicial direction or by a judge."

We agree with Washington that the clerk of court is not vested with the discretion to excuse potential jurors. *See id.* § 607A.3(2) (defining "court" as "the district court of this state and include, when the context requires a judicial officer as defined with section 602.1101); *see also id.* § 602.1101 (defining "judicial officer" as "a supreme court justice, a judge of the court of appeals, a district judge, a district associate judge, an associate juvenile judge, an associate probate judge, or a magistrate").

However, we do not believe the process described by the clerk was a violation; she was not exercising her own discretion but rather was implementing that of the judge. *Cf. Chidester*, 570 N.W.2d at 80 (finding a violation of the statute when the court attendant used "her own judgment" with no specific guidelines from the judge in deciding who should be excused); *see also State v. Martel*, 689 A.2d 1327, 1328 (N.H. 1997) (holding statute, allowing "court" to

excuse jurors from jury duty and defining "court" as a judge, was violated when clerk excused jurors "without obtaining court approval [of the excuses granted]"); *see* State *v. Young*, 853 P.2d 327, 340 (Utah 1993) (holding statute requiring court to decide issues of disqualification of jurors was not violated where court delegated "initial qualification function to a trained court clerk" and allowed the clerk to grant *postponements* to prospective jurors with difficulty or hardships, but reserved for itself the responsibility of "reviewing those forms requiring a discretionary determination"). Moreover, if the potential jurors' reason to be excused was outside of the list previously contemplated by the judge, the requests for deferral were referred to the judge for further consideration.

Because neither of Washington's claims are a violation of the statute, we do not consider whether either was a material violation. Washington's statutory challenges fail.[8]

***2. Constitutional Challenge.***[9] "A defendant challenging the composition of a jury panel must first establish a prima facie violation of the [S]ixth

---

[8] In a paragraph in his brief, Washington lists "other violations" including, "the meaningless certification of the jury pool [and] the very weak efforts to locate potential jurors when the questionnaires were returned or never responded to." Because Washington has not provided cites to the sections of the code he maintains were materially violated and he does not assert how such alleged violations prejudiced him, we decline to consider these claims. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."); *see also Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not speculate on the arguments [the appellant] might have made and then search for legal authority and comb the record for facts to support such arguments.").

[9] We note that in making his constitutional challenge, Washington makes a claim under both the Federal and the Iowa Constitution. In doing so, he "requests that this court use a more defendant favorable standard in ruling on this issue" under the Iowa Constitution. However, in *Chidester*, our supreme court stated, "[T]he protection granted by the Iowa Constitution with respect to the composition and selection of the jury panel is coextensive with that of the Sixth Amendment." 570 N.W.2d at 81 n.1. We are not at liberty to interpret the Iowa Constitution otherwise. *See Figley v. W.S. Indus.*, 801

[A]mendment's fair cross-section requirement." *Chidester*, 570 N.W.2d at 81 (citation omitted). In order to do so, Washington:

> must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).

If Washington is able to do so, "the burden shifts to the State to justify the disproportionate representation by demonstrating that attainment of a fair cross-section is incompatible with a significant state interest." *Id.*

There is no dispute that the group Washington claims is underrepresented—African-Americans—is a distinct group. *See State v. Jones*, 490 N.W.2d 797, 792 (Iowa 1992). Thus, we next consider whether the representation of that group on the jury panel was fair and reasonable in relation to the number of persons in that group in the community.

"There is no requirement that the distinctive group or class be represented in exact proportions to the general population. Some deviation is to be expected." *Id.* at 792–93 (citing *Hoyt v. Florida*, 368 U.S. 57, 69 (1961)). However, if the deviation is substantial, "a prima facie case has been established." *Id.* at 793. The census data for Webster County established that African-Americans comprised 4.1% of the population. Here, four out of 224, or 1.8% of the jury panel, self-identified as African-American. We use the method

---

N.W.2d 602, 608 (Iowa Ct. App. 2011) ("[W]e are not at liberty to overturn precedent of our supreme court."). Thus, we consider both of his challenges under the well-established framework of the Federal Constitution.

prescribed by the Iowa Supreme Court and determine that the absolute disparity is 2.3%. *Id.* (stating absolute disparity computation "is the appropriate method to be used," and it "is determined by taking the percentage of the distinct group in the population and subtracting it from the percentage of that group represented by the jury panel."). We do not believe 2.3% is a "substantial" deviation. *See, e.g.*, *State v. Huffaker*, 493 N.W.2d 832, 834 (Iowa 1992) (finding 2.85% absolute disparity fails to establish a prima facie violation of the Sixth Amendment); *Jones*, 490 N.W.2d at 793 (with 1.5% absolute disparity); *State v. Harkey*, No. 10-0118, 2012 WL 299535, at *7 (Iowa Ct. App. Feb. 1, 2012) (with 5.2% absolute disparity); *State v. Jackson*, No. 09-0462, 2010 WL 624906, at *7 (Iowa Ct. App. Feb. 24, 2010) (with 3.1% absolute disparity).

Because the absolute disparity is not substantial, we consider whether the underrepresentation is due to systematic exclusion of the group in the jury-selection process. "To make this showing, the defendant must show the exclusion is 'inherent in the particular jury-selection process utilized.'" *State v. Fetters*, 562 N.W.2d 770, 777 (Iowa Ct. App. 1997) (quoting *Duren*, 439 U.S. at 366). Washington maintains the use of only the two lists required by statute to determine potential jurors is a systematic exclusion that resulted in the underrepresentation; he asserts that using the public utility list would include more minority members. While we agree that the best practice would involve increasing the number of lists used in order to reach more of the population, Washington cannot establish that the use of the lists of registered voters and current motor vehicle operations is a systematic exclusion. *See, e.g.*, *United States v. Lewis*, 10 F.3d 1086, 1089–90 (4th Cir. 1993); *United States v. Biaggi*,

909 F.2d 662, 676–78 (2d Cir. 1990); *United States v. Cecil*, 836 F.2d 1431, 1444–56 (4th Cir. 1988); *United States v. Clifford*, 640 F.2d 150, 156 (8th Cir. 1981); *State v. Lohr*, 266 N.W.2d 1, 5 (Iowa 1978) ("[T]he compilation of juror lists solely from voter registration print-outs was not unconstitutional.").

Thus, Washington has failed to establish a prima facie violation of the fair cross-section requirement.

**IV. Conclusion.**

After reviewing the record, we find that substantial evidence supports Washington's conviction for murder in the first degree, and the district court did not abuse its discretion in denying Washington's weight-of-the-evidence challenge. Washington has not established that he received ineffective assistance from counsel nor that his right to a jury from a fair cross-section of the community was violated. We affirm.

**AFFIRMED.**