# IN THE COURT OF APPEALS OF IOWA

No. 24-0670
Filed May 7, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**TEVONTAYE EMMANNUEL ELLIOTT,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Scott County, Tom Reidel, Judge.


        A defendant appeals his convictions and sentences following a jury trial.

**AFFIRMED.**


        Danielle A. Dunne of Carney & Appleby, P.L.C., Des Moines, for appellant.

        Brenna Bird, Attorney General, and Aaron Rogers, Assistant Attorney General, for appellee.


        Considered without oral argument by Tabor, C.J., and Schumacher and Chicchelly, JJ.

**SCHUMACHER, Judge.**

Tevontaye Elliott appeals his convictions and sentences following a jury trial on third-degree sexual abuse, indecent exposure, and sexual exploitation of a minor. Elliott challenges the sufficiency of the evidence on his sexual-abuse and indecent-exposure convictions and disputes the admission of a Cellebrite cell phone extraction report into evidence. He also alleges the district court erred in sentencing him to prison and ordering his sentences to run consecutive to a separate sentence imposed for contempt. Upon review, we affirm.

## I.     Background Facts & Proceedings

The following evidence was presented during trial. Elliott met M.R. through an online video-chat platform in August 2022. Elliott was twenty-one years old and living in Canada. M.R. was fourteen years old and living in Bettendorf with her parents. Shortly after the two met, M.R.'s mother discovered M.R. on a video call with Elliott. Because M.R. was prohibited from dating, M.R.'s parents told her she could not have further contact with Elliott and took away her cell phone.

In September, M.R.'s father awoke to find M.R. talking to Elliott on the home's landline telephone after midnight. The call disconnected before M.R.'s father took the phone. M.R.'s father called the last phone number back and asked to speak to Elliott's mother. M.R.'s father expressed concern that Elliott appeared to be a grown adult and M.R. was only fourteen. But Elliott's mother was unreceptive and hung up.

Within minutes, the Bettendorf Police Department received a report from an unknown caller that M.R. was possibly suicidal. Officers were dispatched to M.R.'s home and determined M.R. was not suicidal. As a result, the school resource

officer at M.R.'s school learned of the concerns about M.R. and her contact with Elliott. The school resource officer observed M.R. slipping out of class with her laptop or with borrowed cell phones. M.R.'s parents had removed the landline from their home.

By late December, M.R. had turned fifteen. Without M.R.'s parents' knowledge, Elliott drove from Canada to Bettendorf. Beyond his connection to M.R., Elliott had no personal or professional connections in Bettendorf or other nearby cities. Elliott stayed for about a week through the beginning of January at the Sonesta Select hotel and received visits from M.R. there. Elliott later told Detective Broders of the Bettendorf Police that he "spent a large amount of his time with [M.R.] while he was in town," that "their connection for each other developed," and "that they exchanged promise rings." Both M.R. and Elliott wore their corresponding rings on their left-hand ring finger.

Elliott returned to Bettendorf in May. Elliott checked in to the Clarion Point hotel on May 13 and checked out on May 14. On the morning of May 15, M.R.'s neighbor—whose home was on the same side of M.R.'s house as M.R.'s ground-level bedroom—saw Elliott walking away from M.R.'s house, leaving through the backyard toward an area with no public egress. The following morning, on May 16, the neighbor again saw Elliott. Elliott had just crawled out of M.R.'s bedroom window and was crouched by the window when the neighbor saw him. Elliott again left through the backyard.

Early in the morning of May 18, M.R.'s father went down to M.R.'s bedroom to wake up M.R. and her younger sister for school. M.R. had been sharing her room with her younger sister at the time. In the room, M.R.'s father saw a bottle

of liquor and a pair of men's pants and shoes under M.R.'s bed. M.R.'s mother joined the ensuing commotion before M.R.'s father found Elliott hiding in the bedroom closet, wearing only his underwear.

M.R.'s mother called the police. Elliott told officers that he had come through M.R.'s bedroom window the night before. He denied that any sexual activity occurred and claimed the two only talked and watched movies. M.R. also denied any sexual activity. Meanwhile, M.R.'s neighbor noticed the police presence and recognized Elliott as the man he had observed outside of M.R.'s window a few mornings earlier. The neighbor reported his observations to one of the officers at the scene. Faced with this information, Elliott admitted to officers that May 18 was not the first time he had been to the home. At M.R.'s father's request, Elliott was issued a trespass notice that permanently banned Elliott from returning to the family's home.

On June 23, Elliott's car was parked at Veteran's Memorial Park in Bettendorf. Janelle Hansen had driven her kids to the park, a place they regularly went to play with children attending children's day camps. As expected, a day camp with somewhere between thirty and fifty children was taking place at the park when Hansen and her kids arrived. She parked her car, but before getting her kids out, she noticed Elliott's car. Elliott's car was parked roughly forty feet from the park pavilion where children were located. Hansen noticed the car "appeared to be moving and rocking a lot." Even some of the day camp kids were "pointing and laughing at [Elliott's] car." Inside the vehicle, Hansen could see buttocks and "legs in the air, arms readjusting, what appeared to be a man . . . holding himself up . . . on the back of the seat. . . . The legs were bare and exposed, and so were the

buttocks." Hansen explained "it was pretty apparent that they were having sex in the vehicle." Hansen reported the incident to the Bettendorf police.

Officer Claussen was the first to arrive. Officer Claussen parked his high-profile police sports utility vehicle (SUV) perpendicular to Elliott's car, which had been backed into the parking spot, so the SUV's driver's-side window had a view into the car. In the front passenger seat, Officer Claussen observed Elliott "moving his hips, thrusting in at a very hard and fast pace, completely naked." He saw a pair of arms and legs wrapped around Elliott.

The couple in the car, Elliott and M.R., did not notice Officer Claussen when he pulled up in the marked SUV or when he intentionally slammed the SUV door. Officer Claussen used his knuckles to knock on Elliott's front passenger window "four or five times" before Elliott noticed him. Officer Claussen noticed M.R. was "naked from the waist down." The two inside the vehicle scrambled to put on clothes. Officer Hayes, who had arrived on scene, also witnessed the scramble.

The seat of the front passenger seat was upholstered with black fabric. On the seat, Officer Claussen observed smears of "thick and heavy," "whitish-type fluid" that covered "maybe six inches long and maybe two inches wide," which he associated with "the type of fluid that gets deposited during somebody having sexual intercourse with somebody else."

Elliott was arrested, read his *Miranda*[1] rights, and taken into custody. While still at the scene, M.R. confirmed they were having sex in the car. M.R. explained to Officer Hayes that Elliott wore a condom and that she saw Elliott put it on. After

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966).

being informed that Officer Claussen observed the couple engaging in sex when he arrived, Elliott conceded the act and provided that the sex was consensual. Elliott claimed June 23 was the first time he had sex with M.R.

Detective Broders interviewed Elliott at the Bettendorf Police station, where he was again read his *Miranda* rights. The two discussed the chronology of Elliott's relationship with M.R. Elliott discussed his visit in January, confirming that during the January visit he gave M.R. a promise ring—which Detective Broders had observed on M.R.'s ring finger earlier that day.

As to Elliott's visit mid-May, Elliott told Detective Broders that he stayed at the Clarion Pointe hotel for a week and a half. But the hotel records show Elliott only stayed for one night from May 13 to May 14. Detective Broders said Elliott admitted spending most of his time with M.R. and that "on one day he digitally penetrated [M.R.] The next day he again digitally penetrated [M.R.], which led to vaginal intercourse. And the following day after that, he had vaginal intercourse with [M.R.]" According to Elliott, when he was discovered in M.R.'s bedroom closet it had been approximately two days since his last sexual encounter with M.R.

Elliott also admitted to Detective Broders that he and M.R. were having sex in his car when Officer Claussen arrived on June 23. Elliott described the physical mechanics permitting him to engage in vaginal intercourse despite the confined car space and indicated he did not wear a condom and did not ejaculate.

Officers obtained a search warrant permitting a search of Elliott's phone and M.R.'s phone, both of which were collected on June 23.[2] To extract the phones'

---

[2] M.R.'s parents had returned M.R.'s cell phone to her sometime after the landline incident in September 2022.

contents for review, Bettendorf Police relied on a program called Cellebrite. Cellebrite extracts a cellphone's contents, "whether it's photos, videos, text messages, phone call logs, GPS data, whatever it's able to grab from the phone." The extracted data is then processed through an analyzer, which publishes a report. Both phones were extracted and processed.

Images extracted from Elliott's phone included multiple explicit photos of female genitalia. In the photos was a hand matching M.R.'s distinct physical characteristics, adorned with the ring given by Elliott. Some also contained the same bed sheets as those on M.R.'s bed. Though these images were extracted from Elliott's phone, data indicated the photos were sent from M.R.

Extracted data from Elliott's phone placed him in Bettendorf from at least December 26, 2022, to January 7, 2023. Location data from both phones placed M.R. and Elliott near the Sonesta Select hotel at the same times during these dates, among other places, including M.R.'s house.

A series of videos were also uncovered during the extraction. Metadata indicated the videos were taken on January 3. The distinct design characteristics of the room in which the videos were taken matched the design of the rooms at the Sonesta Select hotel. The series appeared to capture the same singular sex act between Elliott and M.R. over a number of short videos.

At trial, a Bettendorf police detective described one of the videos, which was also played for the jury. "[M.R.] is pictured in the forefront of the video, lying on the bed, wearing a blue sweater." She was nude from the waist down. Elliott was completely nude. The video "depicts Mr. Elliott approaching from an unknown space in the back of the room and coming up behind her, manipulating himself,

and then moving to an area behind her and beginning, what appears to be, thrusting motions and movements behind her, as she speaks to him." In the video, Elliott says to M.R., "You're not supposed to be recording this shit." He then appears to line up his penis behind her and pushes his hips forward. M.R. winces, and Elliott repeatedly tells M.R. to "grind on it."

The State charged Elliott by trial information on seven counts: Counts 1, 2, 3, and 5 charged separate incidences of third-degree sexual abuse in violation of Iowa Code sections 709.1(2) (2023) and 709.4(1)(b)(2)(d), class "C" felonies; Count 4 charged indecent exposure in violation of Iowa Code section 709.9, a serious misdemeanor; Count 6 charged sexual exploitation of a minor in violation of Iowa Code section 728.12(1), a class "C" felony; and Count 7 charged sexual exploitation of a minor in violation of Iowa Code section 728.12(3), an aggravated misdemeanor. A jury convicted Elliott on all counts. Elliott appeals.

## II. Sufficiency of the Evidence

### A. Standard of Review

"We review the sufficiency of the evidence for correction of errors at law." *State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018). "We will uphold the verdict on a sufficiency-of-evidence claim if substantial evidence supports it." *State v. Schiebout*, 944 N.W.2d 666, 670 (Iowa 2020). "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). Our view of the evidence in the light most favorable to the State extends to all available, reasonable inferences. *Schiebout*, 944 N.W.2d at 670.

**B.	Counts 1–3: Third-Degree Sexual Abuse**

Elliott claims there is insufficient evidence to support his convictions for third-degree sexual abuse on counts 1 through 3.  Elliott only argues that for each count of sexual abuse the State failed to establish that Elliott committed a sex act with M.R.

The jury was instructed what conduct could satisfy the sex-act element. *See State v. Maldonado*, 993 N.W.2d 379, 390 n.8 (Iowa Ct. App. 2023) ("Unobjected-to jury instructions serve as the law of the case when reviewing the sufficiency of evidence.").

> "[S]ex act" means any sexual contact:
> 1. By penetration of the penis into the vagina or anus.
> . . . .
> 3. Between the genitals of one person and the genitals or anus of another.
> 4. Between the finger or hand of one person and the genitals or anus of another person.
> . . . .
> The contact must be sexual in nature.  You may consider the type of contact and the circumstances surrounding it in deciding whether the contact was sexual in nature.  Skin-to-skin contact is not required in order to establish a sex act.  Prohibited contact may occur even though the specific body parts are covered.  Prohibited contact occurs when the specified body parts or substitutes touch unless any intervening material would, from objective viewpoint, prevent perception by participants that body parts have touched.

Each count for sexual abuse corresponded to a sex act performed at a separate time.  On Count 1 and Count 2, the State was required to prove Elliott committed two separate sex acts with M.R. between May 13 and May 18, one sex act for each count.  On Count 3, the State was required to prove Elliott committed a sex act with M.R. on June 23.

Although at trial both Elliott and M.R. denied that any sex act had ever occurred between them, both made earlier admissions to law enforcement contrary to their trial testimony. After being interrupted in the park parking lot, both conceded they had been having sex. During a police interview with Detective Broders, Elliott detailed four sex acts committed over three days in May between approximately May 13 and May 18. These admissions were established through officer testimony at trial. But Elliott argues his admissions are insufficient to support the convictions because the State failed to present evidence to corroborate the admissions.

Unless a defendant makes a confession or admission in open court, confessions and "admissions of essential facts or elements of the crime made after the alleged crime must be supported with sufficient corroborating evidence." *State v. Meyers*, 799 N.W.2d 132, 139 (Iowa 2011); Iowa R. Crim. P. 2.21(4). "Corroborating evidence may be either direct or circumstantial. It need not be strong evidence, 'nor need it go to the whole of the case so long as it confirms some material fact connecting the defendant with the crime.'" *Meyers*, 799 N.W.2d at 139 (quoting *State v. Liggins*, 524 N.W.2d 181, 187 (Iowa 1994)). The point of corroborating evidence is not to provide independent proof beyond a reasonable doubt that the crime occurred, but rather it is to fortify the truth of the admissions. *State v. Polly*, 657 N.W.2d 462, 467 (Iowa 2003).

Contrary to Elliott's challenge, the State offered evidence to corroborate the earlier admissions. We turn to the June 23 incident first. Two adult eyewitnesses testified that it was obvious they were witnessing two people having sex. From as close as an arm's length away, Officer Claussen saw Elliott completely naked, hips

bouncing, with M.R.'s arms and bare legs wrapped around him. The seat underneath the two was soiled with what appeared to be bodily fluids produced during sex. Both M.R. and Elliott lied to officers about M.R.'s identity. This evidence corroborates Elliott's admissions that the two were engaged in sexual intercourse on June 23. *See, e.g.*, *Liggins*, 524 N.W.2d at 187–88 (determining the defendant's admissions were corroborated by eyewitness testimony, physical circumstantial evidence, and false statements of material facts to investigators).

As to the sex acts in May, evidence clearly established opportunity. A hotel employee confirmed Elliott's stay from May 13 to 14. M.R.'s neighbor caught Elliott sneaking out of M.R.'s bedroom on May 15 and 16. M.R.'s parents found Elliott in her bedroom on May 18. But Elliott argues the fact that M.R.'s nine-year-old sister stayed in the same room as he and M.R. shows he did not have an opportunity. Ignoring the fact that M.R. was a child, he claims he would not engage in sex acts with children around. And yet the evidence established he did just that at a park packed with children in June. In short, Elliott had the opportunity in May to engage in two separate sex acts, whether at the Clarion Point hotel or in M.R.'s bedroom.

And the evidence presented throughout trial indicated Elliott and M.R. were romantically involved. M.R. defied her parents to be with Elliott. She was slipping out of classes with computers or cell phones, and she stayed up late at night to take clandestine calls. The two exchanged rings, which they both wore on the finger frequently associated with wedding bands or engagement rings. Over a period of roughly six months, Elliott made multiple road trips from Canada to Bettendorf for the singular purpose of spending time with M.R. Viewed as a whole, the evidence corroborates Elliott's admissions. *See State v. Hettinger*,

No. 21-0458, 2022 WL 1486187, at *4 (Iowa Ct. App. May 11, 2022) (finding corroborating evidence when facts showed opportunity and motive).

To be sure, the sex video made in January showed Elliott had a history of engaging in sex acts with M.R. and further corroborated his admissions to sex acts that occurred after the video was made. Collectively, there is ample evidence to corroborate Elliott's admission that he engaged in more than one sex act with M.R. between May 13 and May 18. *See, e.g.*, *Meyers*, 799 N.W.2d at 139–40 (determining corroborating evidence included evidence of opportunity, romantic demeanor, and prior sexual abuse between the defendant and victim).

We are unpersuaded by Elliott's argument that evidence used to corroborate an admission to one act in May cannot be relied on to corroborate his admission to a second act around the same time. To the extent that his argument that each count must have distinguishable corroborating evidence may have some merit, we note that different evidence established multiple opportunities between May 13 and May 18: the hotel records, the neighbor's eyewitness testimony, and the discovery of Elliott in M.R.'s bedroom. This evidence coincides with the timeline Elliott presented in his admission that he performed digital penetration one day, digital and vaginal penetration a second day, and vaginal penetration a third day. In this way, the truthfulness of each admission is fortified by the different pieces of evidence that match separate portions of the timeline Elliott established.

Based on Elliott's admissions to officers and the strength of the evidence to corroborate such, a reasonable jury could find Elliott committed two sex acts on M.R. between May 13 and 18 and committed a sex act on M.R. on June 23. Thus, the jury's verdicts on counts 1, 2, and 3 are supported by substantial evidence.

**C.      Count 4: Indecent Exposure**

Elliott claims the State did not present sufficient evidence to support his conviction for indecent exposure.  To find Elliott guilty of indecent exposure, the jury had to find beyond a reasonable doubt: (1) Elliott "committed a sex act in the presence or view of a third person"; (2) "with the specific intent to arouse or satisfy" his or a third person's sexual desire; (3) "the third person was offended by [Elliott's] conduct"; and (4) Elliott "knew or reasonably should have known that the act was offensive to the third person or to other viewers."

Elliott argues the State failed to establish the first and third elements, that he committed a sex act and that a third person was actually offended by the conduct.  Because we determine that sufficient evidence established that Elliott committed a sex act on June 23, the act relevant to the indecent exposure charge, we need only address Elliott's challenge to the actual offense element.

Section 709.9 establishes "essentially a visual assault crime" that protects unwilling viewers.  *State v. Bauer*, 337 N.W.2d 209, 212 (Iowa 1983) (quoting Kermit L. Dunahoo, *The New Iowa Criminal Code: Part II*, 29 Drake L. Rev. 491, 541 (1980)); *see* Iowa Code § 709.9.  "It is up to the State to show the offensiveness of the conduct."  *Bauer*, 337 N.W.2d at 212.  But "offended" is not some magic word the viewer must use in testimony for the State to carry its burden. *See, e.g.*, *State v. Brice*, No. 19-0863, 2020 WL 3264401, at *2 (Iowa Ct. App. June 17, 2020).  The State can use circumstantial evidence to show the viewer was offended, such as evidence the viewer diverted their gaze.  *See, e.g.*, *id.*; *In re C.R.*, No. 13-1538, 2014 WL 3930460, at *2 (Iowa Ct. App. Aug 13, 2014) ("D.C.'s act of turning away from the exposure is evidence that she was

offended."). *But cf. In re C.C.*, No. 04-0120, 2004 WL 2002603, at *2 (Iowa Ct. App. Sept. 9, 2004) (determining a viewer's description of the exposure as "weird" and not funny was insufficient to show actual offense).

Hansen, a mother of two young children and a former social worker, said when she saw Elliott and M.R. in the car in the park, "it was pretty apparent that they were having sex in the vehicle." She saw Elliott's buttocks and M.R.'s bare legs in the air. She testified the behavior was inappropriate, should not be happening in a public park, and was drawing the attention of some of the kids in the day camp. The scene caused her "mamma instincts" to kick in. She intentionally shielded her children from the scene and reported the incident to the police. And at trial she expressed her disbelief that the sex was happening so close to the park where so many kids were playing: "it's not like they were even parked at the back corner of the parking lot. . . . So I'm like this is not—like this shouldn't be happening in front of all these kids."

Viewing this evidence in the light most favorable to the State, a reasonable jury could find Hansen was offended when she viewed Elliott performing a sex act on M.R. within close proximity and clear view of a park full of children. Because we determine the State presented sufficient evidence that Hansen was offended and Elliott was performing a sex act—the only elements Elliott challenges on appeal—we find sufficient evidence to uphold the jury's verdict of guilt on indecent exposure.

## III.     Admissibility of the Cellphone Extraction Report

Elliott claims the district court improperly admitted into evidence the Cellebrite extraction report that detailed the data uncovered from his phone.

The State disclosed the Cellebrite report to defense counsel on November 9, 2023, as an attachment to minutes of testimony filed on the same date. The State designated the report as an exhibit to be introduced at trial in an amended exhibit list filed on January 5, 2024. According to Elliott, because of the date of the exhibit designation, the use of the report as evidence at trial violated the district court's own discovery order, which required the State to "turn over all exhibits to the defense by 4:30 p.m. on January 3, 2024. Any exhibits not turned over by that time will be excluded from evidence."

A district court's evidentiary rulings are generally reviewed for an abuse of discretion. *State v. Richards*, 809 N.W.2d 80, 89 (Iowa 2012). "An abuse of discretion occurs when the trial court exercises its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *Id.* (quoting *State v. Maghee*, 573 N.W.2d 1, 5 (Iowa 1997)). A court is granted broad latitude when it comes to interpreting the court's own prior order. *Gary v. Heritage Nat'l Healthplan Servs., Inc.*, 485 N.W.2d 851, 854 (Iowa Ct. App. 1992); *see also Dairyland, Inc. v. Jenison*, 207 N.W.2d 753, 755 (Iowa 1973) ("We give weight to the fact the court was ascertaining its own intention.").

A hearing on Elliott's objection to the admissibility of the report was held before trial on the morning defense counsel anticipated the report would be offered into evidence. The State responded to the objection by pointing out the complete Cellebrite report had been provided to defense counsel months earlier and the notice of exhibits filed on January 5 was "to make it clear what was to be introduced." The actual exhibit admitted into evidence was only one section of the report—a section included in full in the November disclosure.

As the district court stated, "The fact that the Cellebrite report, perhaps, wasn't marked as an exhibit does not mean it was not turned over. It was." The district court noted that on January 4 the State also filed a summary report of the Cellebrite report, the summary of which was created for the sole purpose of aiding the investigator slated to testify regarding the Cellebrite extraction report. Thus, the district court determined that at a minimum defense counsel was alerted on January 4 to the specific exhibit the State intended to present at trial. And although January 4 was one day beyond the discovery-order deadline, the district court pointed out that the trial date had been pushed back a few days due to delays since the discovery order had been issued. So the one-day delay did not defeat the purpose of the district court's order—which was to ensure both parties and the court had several days in advance of trial to review exhibits.[3]

We agree with the district court that just because the report was not marked as an exhibit by January 3 does not mean the report had not been "turned over." The district court order required that the exhibits be provided to opposing counsel for review before trial, and as the district court noted, "It was." The district court's decision did not defeat the purpose of the discovery order. Given the district court's reasonableness and broad latitude in interpreting its own prior order, we find no abuse of discretion in its decision to admit the Cellebrite extraction report into evidence. *See Dairyland*, 207 N.W.2d at 755 (affirming the district court's "reasonable rather than hypertechnical construction" of its own order).

---

[3] The jury trial and conviction leading to this appeal occurred after a mistrial was declared in an earlier proceeding. The mistrial resulted when the State played to the jury a video that neither defense counsel nor the court had previously seen.

## IV.     Sentencing

Elliott argues the district court failed to adequately consider mitigating sentencing factors and failed to justify on the record its reasons for imposing a partial consecutive sentence.  He does not dispute that the imposed sentences fall within the statutory limits.

Criminal sentencing is reviewed for errors of law, and the sentence imposed will be upheld unless the sentencing procedure was somehow defective or the district court abused its discretion.  *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002).  A sentence within "the statutory limits is cloaked with a strong presumption in its favor."  *Id.*  "In exercising its discretion, the district court is to weigh all pertinent matters in determining a proper sentence, including the nature of the offense, the attending circumstances, the defendant's age, character, and propensities or chances for reform."  *State v. Johnson*, 513 N.W.2d 717, 719 (Iowa 1994).  "[O]ur task on appeal is not to second guess the decision made by the district court, but to determine if it was unreasonable or based on untenable grounds."  *Formaro*, 638 N.W. 2d at 725.

## A.     Sentencing Factors

Elliott argues the district court improperly placed greater weight on the protection of the community than his need for community-based rehabilitation.  He reasons multiple mitigating factors existed that usually weigh toward leniency in sentencing.

At sentencing, the district court credited Elliott for his lack of criminal history, his positive employment record, and his strong family and community support.  The district court also noted that the presentence investigation report (PSI)

recommendation, which stated deferred judgment was unavailable and recommended incarceration, was "based on an incorrect analysis." So the district court acknowledged Elliott was in fact eligible for deferred judgment.

Weighing against these positive considerations, however, the district court noted its community-protection concerns. It found Elliott's trial testimony to be "shockingly disingenuous," reasoning "we had seen videos of you engaged in sexual acts with [M.R.], and you came in and tried to portray yourselves as just friends who had never engaged in acts such as that." Elliott's repeated failures to follow legal orders also indicated to the district court that Elliott would fail to conform to any probation requirements or instructions from officers. But if incarcerated, the district court noted, Elliott would have access to "moral reconation therapy," which the district court believed would benefit Elliott.

In short, the district court stated:

> When I look at your inability to follow the rules within the community, your inability to be honest with the Court and with the PSI author, it tells me that both a deferred judgment as well as just straight probation are not going to be satisfactory to maximize your own opportunity at rehabilitation, to protect our community from this type of action, and to create a deterrent effect for others.
> . . . .
> This is one of the rare cases where I give little to no weight to the victim impact statement, because it is contrary to the evidence— overwhelmingly credible evidence that was presented at trial of the fact that you were much more than just friends and that she certainly considered you as something other than just as a brother.
> Based on your inability to be honest with the Court, your inability to perhaps be honest with yourself about what you have done and your conduct that led you to sit here today, the Court does believe that incarceration is warranted.

The court then sentenced Elliott to five ten-year terms of imprisonment, one for each of the four counts of third-degree sexual abuse and one for the felony

sexual-exploitation-of-a-minor conviction, one one-year term of imprisonment for the indecent-exposure conviction, and one two-year term of imprisonment for the aggravated-misdemeanor conviction on sexual exploitation of a minor. All seven sentences were ordered to run concurrently.

The district court considered the matters pertinent to sentencing and sufficiently stated on the record its reasons for the sentences imposed. The district court did not abuse its discretion in determining the need to protect the community outweighed the mitigating factors favoring a more lenient sentence.

**B.      Partial Consecutive Sentences**

Lastly, Elliott argues the district court failed to state on the record its reason for requiring the seven concurrent sentences to run consecutively with a 189-day sentence he received for twenty-seven violations of a no-contact order, which prohibited Elliott from having contact with M.R. The order was issued when Elliott was taken into custody on June 23, and all twenty-seven violations occurred during the pendency of his criminal proceedings.

Sentencing courts are required to state on the record their reasons for imposing consecutive sentences. Iowa R. Crim. P. 2.23(2)(g).

When considering the sentences on the criminal convictions, the district stated:

> I'm going to run everything concurrent. I would normally be tempted to run the Sexual Exploitation charge consecutive to the Sex Abuse, because of such a horrendous crime that I think that is, and it's a separate crime from the Sex Abuse in the Third Degree, but having viewed both trials, it is clear that the person whose it appears idea it was to take these videos was not yours, but [M.R.]'s, and that you even at one point in time, if not more than once, tell her she needs to stop, she's not supposed to be doing that while you're engaging in these sexual acts.

The fact that they were on your phone does not put you in the same light as most people and how I would view them for having sexual videos or photographs of minors. I believe that these were sent to you by [M.R.] and not necessarily done at your request. So, accordingly, I'm willing to run those concurrently also.

As to whether to run the sentences with the contempt proceeding, the district court discussed the twenty-seven violations during the sentencing colloquy:

[T]he Court told you to have no contact with [M.R.] during the pendency of this matter. And there is a finding . . . that you violated that on 27 separate occasions. You clearly knew about that No Contact Order and you violated that No Contact Order.
   You were portrayed as a captive audience, but you could have hung up the phone at any time when your mom decided to bring in a third party or when a third party entered that call. Once again, you're not the victim here. You are the perpetrator of these criminal acts.

After issuing sentences for the seven charges on which the jury convicted Elliott, the district court stated, "Counts 1 through 7 shall all run concurrently with each other. They shall be consecutive to the 189-day contempt sentence that was issued . . . as a result of your 27 separate acts of contempt for violating the No Contact Order."

We require a statement of reasons on the record, but "a 'terse and succinct' statement may be sufficient, 'so long as the brevity of the court's statement does not prevent review of the exercise of the trial court's sentencing discretion." *State v. Thacker*, 862 N.W.2d 402, 408 (Iowa 2015) (citation omitted). While the district court's reasoning was brief, do not find reversible error under the present circumstances, as the district court noted the separate nature of the contempt actions as the reason for the consecutive nature of the sentence.

**V.      Conclusion**

For the foregoing reasons, we affirm Elliott's convictions and sentences.

**AFFIRMED.**